1  **THE WESTON FIRM**
2  GREGORY S. WESTON (239944)
   *greg@westonfirm.com*
3  1405 Morena Blvd., Suite 201
   San Diego, CA 92110
4  Telephone:   (619) 798-2006
5  Facsimile:    (619) 343-2789

6  **Counsel for Plaintiff**

7

8              **UNITED STATES DISTRICT COURT**

9       **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10

11 | TIFFNI ALTES, on behalf of herself and all others similarly situated, | Case No: 2:19-cv-04409-ODW-SK |
12 | | |
13 | Plaintiff, | **First Amended Class Action Complaint for Violations of the Unfair Competition Law and Consumer Legal Remedies Act** |
14 | v. | |
15 | BULLETPROOF 360, INC., | |
16 | | **Demand for Jury Trial** |
17 | Defendant. | |

18

19

20

21

22

23

24

25

26

27

28

1

## **TABLE OF CONTENTS**

2   I.   Jurisdiction and Venue ......................................................................... 1

3   II.   Nature of the Action .............................................................................. 1

4   III.   Parties ..................................................................................................... 3

   IV.   Specific Product Claims ......................................................................... 3
5
   V.   The Mayo Clinic's Evaluation of Bulletproof Voffee Is That it Is Bad for Heart
6   Health ...................................................................................................... 9

7   VI.   Bulletproof 360's Health Claims Are Misleading............................... 10

8   VII.   Bulletproof Is an Unapproved New Drug. .......................................... 12

   VIII.   Bulletproof Fails to Contain the Required Warnings for Over the Counter
9   Stimulants. ............................................................................................ 14

10   IX.   Bulletproof's "Zero Sugar" and "0g Sugar" Claims Violate 21 C.F.R. §
11   101.13(h)(1). ......................................................................................... 15

12   X.   Bulletproof's "Zero Sugar" and "0g Sugar" Claims Violate 21 C.F.R. § 101.60............. 15

13   XI.   Bulletproof + Collagen Protein Makes Unauthorized Nutrient Content Claims. ............. 20

   XII.   Bulletproof Makes Unauthorized Health Claims. ............................... 20
14
   XIII.   Bulletproof Is False, Misleading, and Misbranded. ........................... 21
15
   XIV.   Plaintiff's Purchases of Bulletproof Coffee ....................................... 24
16
   XV.   Reliance and Injury............................................................................... 24
17
   XVI.   Class Action Allegations ...................................................................... 25
18
   XVII. Causes of Action................................................................................... 27

19   XVIII.Prayer for Relief .................................................................................. 30

   XIX.   Jury Demand.......................................................................................... 31

20

21

22

23

24

25

26

27

28

i

Plaintiff Tiffni Altes, on behalf of herself, all others similarly situated, and the general public, by and through her undersigned counsel, hereby sues Bulletproof 360, Inc. ("Defendant" or "Bulletproof 360") and upon information and belief and investigation of counsel, alleges as follows:

## I.    JURISDICTION AND VENUE

1.    The Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (The Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs and because more than two-thirds of the members of the class defined herein reside in states other than the state of which Defendant resides.

2.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiff Tiffni Altes suffered injuries as a result of Defendant's acts in this District, many of the acts and transactions giving rise to this action occurred in this District and Defendant: (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets of this District through the distribution and sale of its products in this District; and (2) is subject to personal jurisdiction in this District.

## II.    NATURE OF THE ACTION

3.    Defendant manufactures, markets, distributes, and sells the Bulletproof Cold Brew Coffee. Bulletproof Cold Brew Coffee is coffee with a large amount of added butter and coconut oil extract, and includes an extraordinary amount of saturated fat, in a quantity that increases risk of heart disease.[1]

4.    Bulletproof Cold Brew products are widely-distributed and can be found at stores such as Target and Ralph's. According to the company's press release, they are the best-selling ready-to-drink coffee products at Whole Foods and Sprouts.[2] This popularity,

---

[1] Tokle, et al. *Rise in Serum Lipids After Dietary Incorporation of "Bulletproof Coffee."* 9 J. OF CLINICAL LIPIDOLOGY, 462 (June 2015), *available at* https://www.lipidjournal.com/article/S1933-2874(15)00170-1/pdf.
[2] *See* https://www.marketwatch.com/press-release/bulletproofs-retail-product-expansion-

1

however, is driven by Defendant's unlawful and fraudulent claims.

5.    Bulletproof 360 was founded by and is led by David Asprey. Mr. Asprey calls himself the "Father of Biohacking and New York Times bestselling science author," though he has "no medical degree or nutritional training,"

> Asprey happily shares his opinion on how often men should ejaculate (once a week, but have sex more often) and how long they should sleep (six hours is good; eight hours is too much). He thinks you should go to Burning Man (because it'll activate your creativity) and stop eating kale (because it contains trace amounts of oxalic acid).[3]

Indeed,

> Unsurprisingly, this has made Asprey suspicious of regulation. "Regulation got us the food pyramid that causes heart disease, cancer, and diabetes in unprecedented numbers of people," he told me. "It got us an incredibly slow-to-innovate medical system that's now being disrupted. It is antihuman to tell someone that they do not have the choice to put whatever they want into their bodies. It's a basic human freedom. I think it's unethical that I need to spend $150 and an hour of my life to get a permission slip to take a substance. There is no, no reason for that."

*Id.*

6.    Consistent with its CEO's contempt for the FDA as "antihuman" and violating "basic human freedom," Bulletproof 360 **casually ignores all FDA regulations** regarding nutrient content claims on its Bulletproof Cold Brew products.

7.    Bulletproof 360 also unlawfully makes wild claims that adding large amounts of butter and its proprietary "Brain Octane Oil" to coffee has a variety of medical benefits, in a manner that renders the product an unapproved new drug.

---

to-reach-over-20000-new-stores-nationwide-2019-03-05 (last visited July 19, 2019).

[3] Rachel Monroe, *The Bulletproof Coffee Founder Has Spent $1 Million in His Quest to Live to 180.* Men's Health Magazine (January 23, 2019)

*available at*: www.menshealth.com/health/a25902826/bulletproof-dave-asprey-biohacking/ (Accessed 21 May 2019).

*Altes v. Bulletproof 360, Inc.,* Case No. 2:19-cv-04409-ODW-SK
PLAINTIFF'S FIRST AMENDED COMPLAINT

8.     In addition to Bulletproof 360's illegal label claims and illegal medical benefit marketing claims, it also promotes on its labels and through a multimedia campaign that coffee from other companies is dirty, unsafe, and full of "toxins" and only its "certified clean coffee" is truly safe to drink

9.     These illegal tactics allow Bulletproof 360 to sell its products for well over double the price of other premium coffee brands such as Starbucks.

10.     This action is brought to remedy Defendant's unfair, deceptive, and unlawful conduct. On behalf of the class defined herein, Plaintiff seeks an order compelling Bulletproof 360 to, *inter alia*: (1) cease marketing and selling Bulletproof Cold Brew using the false, misleading, deceptive, and unconscionable tactics complained of herein; (2) conduct a corrective advertising campaign; (3) destroy all misleading and deceptive materials and products; (4) award Plaintiff and the Class members restitution, actual damages, and punitive damages to the extent permitted under the law; and (5) pay costs, expenses, and reasonable attorney fees.

## III.   <u>PARTIES</u>

11.     Plaintiff Tiffni Altes is a resident of Los Angeles County who purchased Bulletproof Coffee during the Class Period.

12.     Defendant Bulletproof 360, Inc. is a Delaware corporation with its principal place of business in Seattle, Washington. Bulletproof 360, Inc. markets, distributes, and sells the Bulletproof Cold Brew products in California.

## IV.   <u>SPECIFIC PRODUCT CLAIMS</u>

13.     In one label variation which was in use until at least October 2018, the flavors "Original", "Vanilla", "and "Mocha" incorporate the following claims on the product label:

- "Certified Clean Coffee";
- "Brain Octane Oil"; and
- "It's clean coffee certified to be free of 27 energy-sapping toxins, plus grass-

3

fed butter and Bulletproof Brain Octane Oil—extracted from the most potent part of the coconut—to power your brain and body and give you steady, all day energy."

14.   The product label appears as follows:



15.   Prior to October 2018, Bulletproof Cold Brew Coffee + Collagen Protein was also available in "Original," "Dark Chocolate," and "Vanilla Latte", "Caramel", and "Vanilla Latte" flavors. Each flavor repeats the claims listed above and adds the following additional claims:

- "All Day Energy + Protein"; and

- "Bulletproof® Coffee with collagen protein is delicious coffee plus grass-

4

1  fed butter and Bulletproof Brain Octane® oil—extracted from the most

2  potent part of the coconut—to power your brain and body, with grass-fed

3  collagen protein added for strong muscles and healthy skin."

4  16.   The product label appears as follows:



17.   The labels were revised in October 2018 and represent those that are currently in use, the flavors "Original", "Vanilla", "and "Mocha" incorporate the following claims on product label:

- "Brain Octane Oil";

- "Fuel to Sustain Your Mind and Body";

- "0g Sugar";

5

- "Lasting Energy"; and

- "Fewer Cravings [¶] Brain Octane Oil Powers Your Brain and Curbs Snack Attacks".

18.   The product label appears as follows:



19.   Since around October 2018, Bulletproof Cold Brew Coffee + Collagen Protein has also been available in "Original," "Dark Chocolate," and "Vanilla Latte", "Caramel", and "Vanilla Latte" flavors. Each flavor repeats the claims made on the post-October 2018 packaging and adds an additional claim: "Essential for Hair, Skin & Nails [¶] 15g of Collagen Protein Pack a Beautiful Punch."

20.   The product label appears as follows:

6



21.     All versions of Bulletproof Cold Brew Coffee reference and thus incorporate by reference bulletproofcoffee.com or bulletproof.com, which include the following deceptive claims:

- "Our cold brew packs a punch. Made with clean beans and infused with Brain Octane® Oil and grass-fed butter, this zero-sugar cold brew gives you enough energy and focus to feel like a boss all day long."

- "CERTIFIED CLEAN COFFEE Not all coffee is created equal. The best coffee is clean. Free of energy-sapping mold toxins that slow you down. Our beans are farmed, screened, and tested to be free of 27 common toxins to keep you mentally and physically feeling your best."

7

- "BRAIN OCTANE OIL Completely flavorless and totally satisfying, this oil is extracted from the most potent part of the coconut. It gives your body what it needs—efficient high-energy fuel to power your body."

- "GRASS-FED BUTTER Butter from grass-fed cows is higher in butyrate, a fatty acid that aids in digestion as well as Vitamin K2, which helps push the calcium to your bones—not your arteries."

- "Bulletproof Brain Octane oil and XCT oil are MCT oils. But better. They contain what you want in an MCT oil that actually works: pure, triple-distilled quality fats that give you more energy, better mental performance and fewer cravings."

- "Your body turns MCTs into molecules called ketones, which help burn fat, curb cravings and power your brain. TLDR: Ketones give you incredible energy."

- "That said, not all MCTs are the same. Brain Octane oil gives you four times more ketone energy than coconut oil.[7] That means you get more brain-powering, fat-burning power than you would with generic MCT oil."

- "C8 (caprylic acid): This is Brain Octane oil, and it's the all-around best MCT for ketogenic energy. It produces more ketones than coconut oil, which means more ketone benefits like amplified energy, fat loss and metabolic burn."

- "Bottom line: C8 and C10 are the best types of MCTs overall, whether you follow the keto diet or just want more energy. Bulletproof only uses C8 and C10 MCT oils. That matters."

22.     Further, the Bulletproof website contains a page titled "Weight Loss and Diet" which includes the following misleading statements and provides links to purchase the Bulletproof Cold Brew Coffee products, touting them as a "top selling product[] to support the Bulletproof diet":

- "No More Cravings"

- "For more energy and fewer snack attacks, choose quality fats instead of sugar and follow a low-carb or keto diet. You'll be glad you did."

8

- "Brain Octane oil is added for brain power and suppressing hunger, while the grass-fed butter boasts higher levels of omega-3 fatty acids."

23.     The Bulletproof website also contains a link to download "The Bulletproof Diet Road Map." An excerpt of the "Diet Road Map" is as follows:





24.     The graphic claims Bulletproof's coffee allows consumers to "reduce body fat" and can assist with "fat loss."

## V.   THE MAYO CLINIC'S EVALUATION OF BULLETPROOF COFFEE IS THAT IT IS BAD FOR HEART HEALTH

25.     Contrary to Bulletproof 360's misleading health claims, Katherine Zeratsky, a dietician at the Mayo Clinic, advises:

9

When you add things like butter and coconut oil to your coffee, you're adding a significant amount of saturated fat and a significant amount of calories . . . those extra calories and the imbalance it might be creating in your diet might not work for you and your long-term health.[4]

26.    Further, Zeratsky warns that Bulletproof coffee contains a large quantity of saturated fat which "is known to raise our cholesterol, thus increasing our risk of heart disease and potentially other cardiovascular-related problems." *Id.*

## VI.    BULLETPROOF 360'S HEALTH CLAIMS ARE MISLEADING.

27.    The claims made by Defendant on the Bulletproof Cold Brew Coffee product labels and website imply that the products are a healthy alternative to regular coffee.

28.    However, these claims are deceptive and misleading.

29.    For example, Defendant claims that "not all coffee is created equal," and that Bulletproof's coffee "beans are farmed, screened, and tested to be free of 27 common toxins to keep you mentally and physically feeling your best."

30.    While mycotoxins may be present in some coffee beans, studies have shown that "coffee intake does not represent a potential risk for consumers with respect to individual mycotoxin contamination."[5]

31.    Contrary to Defendant's implication that consuming competing coffee results in health risks, regular coffee consumption has been shown to be "inversely associated with total and cause-specific mortality."[6]

---

[4] Blazer, D. *Mayo Clinic Minute: Why the 'bulletproof coffee' trend isn't a magic bullet.* The Mayo Clinic. December 6, 2018. *Available at* https://newsnetwork.mayoclinic.org/discussion/mayo-clinic-minute-why-the-bulletproof-coffee-trend-isnt-a-magic-bullet/ (last visited July 30, 2019).

[5] Garcia-Moralega, et al., *Analysis of mycotoxins in coffee and risk assessment in Spanish adolescents and adults.* 86 FOOD AND CHEMICAL TOXICOLOGY 225-233 (2015).

[6] Freedman, et al. *Association of Coffee Drinking with Total and Cause Specific Mortality.* 366 N. ENGL. J. MED. 1891-1904 (2012).

10

32.   Further, Defendant claims that consuming its "Brain Octane Oil," which is a medium chain triglyceride oil ("MCT oil"),[7] will result in "fewer cravings," "curb[] snack attacks," and "power your brain."

33.   Bulletproof 360 further claims "ZERO SUGAR" and "0G SUGAR." This claim is deceptive and unlawful due to the products' high content of calories, total fat, and saturated fat, and Defendant's failure to provide the "not a low calorie food" disclaimer as required by 21 C.F.R. § 101.13(h)(1).

34.   A single bottle of Bulletproof Cold Brew Coffee contains 8g of saturated fat. The FDA recommends consumers limit their saturated fat consumption to 20g per day, meaning each small bottle of Bulletproof Cold Brew Coffee contains 40% of the daily value recommended by the FDA.

35.   The American Heart Association ("AHA") recommends consumers limit their saturated fat consumption to 13g per day, meaning each small bottle contains 62% of the total AHA limit for saturated fat.[8]

36.   The average American adult obtains approximately 10.9% of their calories from saturated fat.[9] Based on a 2,000-calorie diet, this equates to about 24.2g of saturated fat daily, which is significantly more that the amounts recommended by the FDA and AHA.

37.   Thus, Americans seeking to improve their health would not benefit from consuming Bulletproof Cold Brew products due to their high saturated fat content.

---

[7] Brain Octane vs. MCT Oil: What's The Difference?, *Bulletproof Blog*. Available at: https://blog.bulletproof.com/the-definitive-guide-to-mcts/ (Accessed 21 May 2019).

[8] American Heart Association, *Saturated Fat*; Available at: https://www.heart.org/en/healthy-living/healthy-eating/eat-smart/fats/saturated-fats (Accessed 21 May 2019).

[9] U.S. Dept. of Health and Human Services and U.S. Dept. of Agriculture, *2015–2020 Dietary Guidelines for Americans*. 8th Edition. December 2015. Available at: https://health.gov/dietaryguidelines/2015/guidelines/chapter-2/a-closer-look-at-current-intakes-and-recommended-shifts/#callout-solidfats (Accessed 21 May 2019).

## VII.   BULLETPROOF IS AN UNAPPROVED NEW DRUG.

38.     During the Class Period, the Bulletproof Cold Brew Coffee label and website made the following drug claims:

- "Fewer Cravings [¶] Brain Octane Oil Powers Your Brain and Curbs Snack Attacks."

- "BRAIN OCTANE OIL Completely flavorless and totally satisfying, this oil is extracted from the most potent part of the coconut. It gives your body what it needs—efficient high-energy fuel to power your body."

- "Our cold brew packs a punch. Made with clean beans and infused with Brain Octane® Oil and grass-fed butter, this zero-sugar cold brew gives you enough energy and focus to feel like a boss all day long."

- "Bulletproof Brain Octane oil and XCT oil are MCT oils. But better. They contain what you want in an MCT oil that actually works: pure, triple-distilled quality fats that give you more energy, better mental performance and fewer cravings."

- "Your body turns MCTs into molecules called ketones, which help burn fat, curb cravings and power your brain. TLDR: Ketones give you incredible energy."

- "That said, not all MCTs are the same. Brain Octane oil gives you four times more ketone energy than coconut oil. That means you get more brain-powering, fat-burning power than you would with generic MCT oil."

- "C8 (caprylic acid): This is Brain Octane oil, and it's the all-around best MCT for ketogenic energy. It produces more ketones than coconut oil, which means more ketone benefits like amplified energy, fat loss and metabolic burn."

- Bottom line: C8 and C10 are the best types of MCTs overall, whether you follow the keto diet or just want more energy. Bulletproof only uses C8 and C10 MCT oils. That matters."

- Further, the Bulletproof website contains a page titled "Weight Loss and Diet" which includes the following misleading statements and provides links to purchase

12

the Bulletproof Cold Brew Coffee products, touting them as a "top selling product[] to support the Bulletproof diet":

- "No More Cravings"
- For more energy and fewer snack attacks, choose quality fats instead of sugar and follow a low-carb or keto diet. You'll be glad you did."
- "Brain Octane oil is added for brain power and suppressing hunger, while the grass-fed butter boasts higher levels of omega-3 fatty acids."

39.     The FDA recognizes such claims as drug claims. Attached hereto as **Exhibit 1** are FDA Warning Letters relating to similar claims that the FDA considers to be unapproved new drug claims.

40.     Bulletproof Cold Brew Coffee is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the condition recommended by its labeling.

41.     "No person shall introduce or deliver for introduction into interstate commerce any new drug . . ." without approval by the FDA. 21 U.S.C § 355(a); *see also* 21 U.S.C. § 331(d).

42.     Bulletproof 360's failure to comply with the FDA regulations its CEO ridicules as "antihuman" endangers the health of its customers, and further gives it an unfair advantage over competitors that do comply with state and federal law.

43.     In addition, Bulletproof Cold Brew Coffee products are misbranded because they are foods intended for human consumption which are offered for sale and for which a claim is made on the labeling which expressly and by implication characterizes the relationship of any nutrient to a disease or a health-related condition.

44.     The Bulletproof Cold Brew Coffee products do not qualify for the reduced level of regulation applicable to certain nutrition supplement products for several reasons:

- The website and labels neither describe the role of any nutrient or dietary ingredient intended to affect the structure or function in humans, characterize

13

the documented mechanism by which any nutrient or dietary ingredient acts to maintain such structure or function, nor describes general well-being from consumption of any nutrient or dietary ingredient. 21 U.S.C. § 343(r)(6)(A).

- The claims on the website and labels do not relate to any classical nutrient deficiency. 21 U.S.C. § 343(r)(6)(A).

45.    California similarly prohibits the sale of unapproved new drugs. Cal. Health & Saf. Code § 111550(a)(1).

## VIII.    BULLETPROOF FAILS TO CONTAIN THE REQUIRED WARNINGS FOR OVER THE COUNTER STIMULANTS.

46.    "Stimulant" means a "drug which helps restore mental alertness or wakefulness during fatigue or drowsiness." 21 C.F.R. § 340.3.

47.    Defendant's claims render the Bulletproof Cold Brew products over-the-counter stimulant drugs:

- "Brain Octane Oil Powers Your Brain"
- "this zero-sugar cold brew gives you enough energy and focus to feel like a boss all day long."
- "Lasting Energy"
- "Energize"
- "Drink. Energize. Perform."
- "power your brain and body and give you steady, all-day energy."
- "Zero sugar means zero sugar crashes"
- "Fuel to sustain your body and mind"

48.    "An over-the-counter stimulant drug product in a form suitable for oral administration is generally recognized as safe and effective and is not misbranded if it meets each of the conditions in this part and each of the general conditions established in § 330.1." 21 C.F.R. § 340.1(a).

49.    Here, Defendant fails to meet any of the requirements identified in 21 C.F.R.

14

1 §§ 330.1 & 340.50, and the Bulletproof Cold Brew products are therefore not generally
2 recognized as safe and effective and are misbranded.

3 **IX.   BULLETPROOF'S "ZERO SUGAR" AND "0G SUGAR" CLAIMS**
4 **VIOLATE 21 C.F.R. § 101.13(H)(1).**

5    50.   "A claim that expressly or implicitly characterizes the level of a nutrient . . .
6 may not be made on the label or in labeling of foods unless the claim is made in
7 accordance with this regulation . . . ." 21 C.F.R. § 101.13(b). "An expressed nutrient
8 content claim is any direct statement about the level (or range) of a nutrient in the food,
9 e.g., 'low sodium' or 'contains 100 calories.'" 21 C.F.R. § 101.13(b)(1).

10    51.   Bulletproof 360's "Zero Sugar" and "0g Sugar" claims constitute expressed
11 nutrient content claims pursuant to 21 C.F.R. § 101.13(b)(1).

12    52.   "If a food . . . contains more than 13.0 g of fat, 4.0 g of saturated fat, 60
13 milligrams (mg) of cholesterol, or 480 mg of sodium . . . per labeled serving . . . , **then**
14 **that food must bear a statement disclosing that the nutrient exceeding the specified**
15 **level is present in the food** as follows: 'See nutrition information for ____ content' with
16 the blank filled in with the identity of the nutrient exceeding the specified level, e.g., 'See
17 nutrition information for fat content.'" 21 C.F.R. § 101.13(h)(1).

18    53.   Here, the Bulletproof Cold Brew products contain anywhere from 11-15g of
19 fat, and 9-13g of saturated fat per labeled serving, far exceeding that threshold. Further,
20 each label introduced in October 2018 included a nutrient content claim: "0G SUGAR."
21 Nevertheless, the labels fail to contain a statement disclosing that the fat or saturated fat
22 exceed the specified level.

23 **X.   BULLETPROOF'S "ZERO SUGAR" AND "0G SUGAR" CLAIMS**
24 **VIOLATE 21 C.F.R. § 101.60**

25    54.   The "FDA has historically taken the position that consumers may associate
26 claims regarding the absence of sugar with weight control and with foods that are low
27 calorie or that have been altered to reduce calories significantly. Therefore, the definition

28

for 'sugar free' includes the requirement that any food that is not low or reduced in calorie disclose that fact. Without such information some consumers might think the food was offered for weight control."[10]

55.    "Consumers may reasonably be expected to regard terms that represent that the food contains no sugars or sweeteners e.g., 'sugar free,' or 'no sugar,' as indicating a product which is low in calories or significantly reduced in calories." 21 C.F.R. § 101.60.

56.    Food and drink products may not bear such claims unless:

(i) The food contains less than 0.5 g of sugars, as defined in § 101.9(c)(6)(ii), per reference amount customarily consumed and per labeled serving or, in the case of a meal product or main dish product, less than 0.5 g of sugars per labeled serving; and

(ii) The food contains no ingredient that is a sugar or that is generally understood by consumers to contain sugars unless the listing of the ingredient in the ingredient statement is followed by an asterisk that refers to the statement below the list of ingredients, which states "adds a trivial amount of sugar," "adds a negligible amount of sugar," or "adds a dietarily insignificant amount of sugar;" and

(iii)
(A) It is labeled "low calorie" or "reduced calorie" or bears a relative claim of special dietary usefulness labeled in compliance with paragraphs (b)(2), (b)(3), (b)(4), or (b)(5) of this section, or, if a dietary supplement, it meets the definition in paragraph (b)(2) of this section for "low calorie" but is prohibited by §§ 101.13(b)(5) and 101.60(a)(4) from bearing the claim; or
(B) Such term is immediately accompanied, each time it is used, by either the statement "not a reduced calorie food," "not a low calorie food," or "not for weight control."

57.    Since around October 2018, the packaging of Bulletproof Cold Brew Coffee products has included the claims that Bulletproof contains "ZERO SUGAR" and "0G SUGAR," but the products do not meet the requirements set forth in 21 C.F.R. §

---

[10] Food and Drug Administration, *Guidance for Industry and FDA: Dear Manufacturer Letter Regarding Sugar Free Claims* (September 2007). *Available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-and-fda-dear-manufacturer-letter-regarding-sugar-free-claims (last visited July 31, 2019).

101.60(c)(2)(i), (ii), or (iii).

58.     Pursuant to 21 C.F.R. § 101.60(2)(iii)(b), the Bulletproof Cold Brew Coffee products are required to bear the phrase "not a reduced calorie food," "not a low calorie food," or "not for weight control" immediately after the "ZERO SUGAR" and "0G SUGAR" claims.

59.     Examples of products properly labeled in compliance with 21 C.F.R. § 101.60(2)(iii)(b) are as follows:

 

17







18





60.     Bulletproof 360's failure to comply with 21 C.F.R. § 101.60 is deceptive because "[c]onsumers may reasonably be expected to regard terms that represent that the

19

food contains no sugars or sweeteners e.g., 'sugar free,' or 'no sugar,' as indicating a product which is low in calories or significantly reduced in calories." 21 C.F.R. § 101.60.

61.     In truth, each flavor of the Bulletproof Cold Brew Coffee products, heavily promoted as a weight loss product, contain at least as many calories as a 12-ounce can of Coca-Cola.

## XI.   BULLETPROOF + COLLAGEN PROTEIN MAKES UNAUTHORIZED NUTRIENT CONTENT CLAIMS.

62.     In addition to the prior unlawful claims, the packaging of the post-October 2018 Bulletproof Cold Brew + Collagen Protein products included the following claim: "Essential for Hair, Skin & Nails 15g of Collagen Protein Pack a Beautiful Punch." However, there is no regulation that permits such a nutrient content claim, and its use is unlawful. Moreover, even if this claim were authorized, it would still require a disclosure statement regarding the high level of fat in the product.

63.     If a food . . . contains more than 13.0 g of fat, 4.0 g of saturated fat, 60 milligrams (mg) of cholesterol, or 480 mg of sodium . . . per labeled serving . . . , **then that food must bear a statement disclosing that the nutrient exceeding the specified level is present in the food** as follows: 'See nutrition information for _____ content' with the blank filled in with the identity of the nutrient exceeding the specified level, e.g., 'See nutrition information for fat content.'" 21 C.F.R. § 101.13(h)(1)

64.     No such disclosure statement is made.

## XII.   BULLETPROOF MAKES UNAUTHORIZED HEALTH CLAIMS.

65.     Products containing at least 4g per serving of saturated fat are "disqualif[ed] from making a health claim" unless they meet the exceptions identified in 21 C.F.R. § 101.14(e). The Bulletproof Coffee Cold Brew products contain 8g of saturated fat per serving and do not qualify for the exceptions identified in 21 C.F.R. § 101.14(e).

66.     The Bulletproof website makes the following claim relating to heart health: "GRASS-FED BUTTER Butter from grass-fed cows is higher in butyrate, a

20

fatty acid that aids in digestion as well as Vitamin K2, which helps push the calcium to your bones—not your arteries."

67.     Pursuant to 21 C.F.R. § 101.14(a), a

[h]ealth claim means any claim made on the label or in labeling of a food, including a dietary supplement, that expressly or by implication, including "third party" references, written statements (e.g., a brand name including a term such as "heart"), symbols (e.g., a heart symbol), or vignettes, characterizes the relationship of any substance to a disease or health-related condition. Implied health claims include those statements, symbols, vignettes, or other forms of communication that suggest, within the context in which they are presented, that a relationship exists between the presence or level of a substance in the food and a disease or health-related condition

68.     This claim constitutes a "health claim" within the meaning of 21 C.F.R. § 101.14(a)(1). It claims an ingredient in the product reduces the risk of heart disease and osteoporosis by "push[ing] calcium to your bones—not your arteries."

69.     Bulletproof 360 violated 21 C.F.R. § 101.14 because it made a claim relating to heart and bone health despite containing disqualifying levels of saturated fat pursuant to 21 C.F.R. § 101.14(d) and (e).

70.     The same claim is misleading as there is no evidence that "butter from grass fed cows" causes calcium to accumulate in the bones rather than the arteries. In fact, all types of butter are very high in saturated fat and result in increases in "bad" LDL blood cholesterol levels. Indeed, because butter is a highly refined source of saturated fat, the effect on blood and heart health is stronger than similar unrefined or less-refined sources of saturated fat, such as cheese, dairy cream, and avocado.

## XIII.  BULLETPROOF IS FALSE, MISLEADING, AND MISBRANDED.

71.     It is unlawful to manufacture or sell any food or drug that is misbranded. 21 U.S.C. § 331(a), (b), (c), & (g).

72.     A food or drug is misbranded "[i]f its labeling is false or misleading in any particular." 21 U.S.C. § 352(a)(1) (misbranded drugs); 21 U.S.C. § 343(a) (misbranded food).

21

73.     Because Bulletproof Cold Brew Coffee claims to treat conditions not amenable to self-diagnosis, directions cannot be written such that a layperson can safely use these products to treat those conditions. The labels therefore lack "adequate directions for use," and are misbranded under 21 U.S.C. § 352(f)(1); Cal. Health & Saf. Code § 111375(a).

74.     Neither the labels nor the website state in boldface type that "This statement has not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure, or prevent any disease." 21 U.S.C. § 343(r)(6)(C).

75.     Further, Defendant uses health claims to deceptively market the Bulletproof Cold Brew Products as products which will aide in weight-loss, which is deceptive due to the product's high saturated fat content high calorie content and lack of nutrients.

76.     The Bulletproof Cold Brew Product purchased by Plaintiff bear the following claims on the product label: "fewer cravings", "fuel to sustain your body and mind", as well as "Brain octane oil powers your brain and curbs against snack attacks."

77.     These label claims lead a reasonable consumer to believe that they are purchasing a product beneficial for their health and that will assist in weight-loss, when in fact these claims are deceptive, and the product's high saturated fat content can adversely impact health.

78.     Multiple studies show consumption of Bulletproof coffee causes a "rise cholesterol levels" and "worsening lipid levels" which represents a "cardiovascular risk factor."[11]

79.     In 2014, Dr. Karl Nodolsky of Walter Reed Medical Center and the American Board of Obesity Medicine reported a "a 39-year-old male" patient "with no previous cardiovascular risk factors developed elevated and at-risk levels of LDL

---

[11] Tokle, et al. *Rise in Serum Lipids After Dietary Incorporation of "Bulletproof Coffee."* 9 J. OF CLINICAL LIPIDOLOGY 462 (June 2015), *available at* https://www.lipidjournal.com/article/S1933-2874(15)00170-1/pdf.

cholesterol (198) and apolipoprotein B (133)" after "drinking 'bulletproof coffee'" "every morning" for a "few months."[12] During that time, the patient's "total cholesterol jumped from 248 to 282, HDL from 59 to 66, LDL from 180 to 198, and triglycerides from 41 to 73. The apolipoprotein scan revealed a level of 133, which was high-risk." *Id.* Dr. Nadolsky "attributed it to the bulletproof coffee intake." *Id.*

80.    Dr. Nadolsky and his co-authors provide the following synopsis regarding the consumption of Bulletproof Coffee products:

> There has been recent renewed interest in supplementation with medium-chain triglyceride (MCT) oils and coconut oils in addition to consumption of organic grass-fed butter due to proposed alleged health benefits by those who recommend and practice high-fat diets within the health and wellness community. Suggested benefits include weight loss, increased energy, and cardiometabolic improvements of lipoproteins, inflammation and insulin sensitivity. The basis of this pro-saturated fatty acid campaign is purposefully contradictory to many mainstream federal health and medical dietary recommendations including the FDA.[13]

81.    Nadolsky warns:

> there have . . .  recently been anecdotally reported cases of significantly increased atherogenic lipidemia in otherwise healthy patients who have added butter and/or MCT to their baseline diet. This is concerning from a public health perspective because measures of atherogenic lipoproteins may be significantly increased as demonstrated by the patient presented who's non-HDLc rose from 155 mg/dL (<50th %ile) prior to a higher SFA diet to 189 mg/dL then jumped to 216 mg/dL after adding butter and MCT oil along with apoB of 133 mg/dL (both > 80th %ile) concerning for increasing his risk of atherosclerotic cardiovascular disease. *Id.*

82.    Defendant's false and misleading conduct also violates California's several

---

[12] *'Bulletproof' Coffee May Hike Lipids.* MedPage Today. May 26, 2014. *Available at* www.medpagetoday.com/MeetingCoverage/AACE/45810 (last visited July 30, 2019).

[13] Nadolsky, K. et al. *Does the "B" in 'Bulletproof Coffee' stand for ApoB*; AACE 2014.

consumer protection laws. *See* Cal. Bus. & Prof. Code §§ 17200, *et seq.*, Cal. Civ. Code § 1750, *et seq*.

## XIV.  **PLAINTIFF'S PURCHASES OF BULLETPROOF COFFEE**

83.     Plaintiff Tiffni Altes purchased Bulletproof Cold Brew Coffee at least twice in the last two years at Whole Foods Market located at 24130 Valencia Blvd., Santa Clarita. Her most recent purchase was in December 2018. Plaintiff purchased Bulletproof Cold Brew Coffee products in both the pre-October 2018 and post-October packaging variations pictured *supra*. Plaintiff would not have purchased Bulletproof Cold Brew products had she known that they were unlawfully labeled, misbranded, contained false claims, and an unapproved new drug.

84.     Plaintiff suffered injury in fact and lost money or property as a result of Defendant's deceptive advertising. She was denied the benefit of the bargain when she decided to purchase Bulletproof Cold Brew products instead of other coffee products which are neither unlawful or falsely advertised.

## XV.  **RELIANCE AND INJURY**

85.     When purchasing Bulletproof Cold Brew Coffee, Plaintiff was seeking a product that was beneficial to her health. She lost money as a result of Defendant's conduct because she purchased products that were detrimental to her health and were unfairly offered for sale in violation of federal and California law. Had Defendant not violated the law, Plaintiff would not have suffered these injuries.

86.     In deciding to purchase Bulletproof Cold Brew Coffee, Mrs. Altes relied on the label as a whole and, *inter alia*, the following deceptive claims:

- "Brain Octane Oil";
- "Fuel to Sustain Your Mind and Body";
- "0G SUGAR";
- "ZERO SUGAR"

24

- "Lasting Energy";
- "Fewer Cravings [¶] Brain Octane Oil Powers Your Brain and Curbs Snack Attacks".
- "Certified Clean Coffee";
- "It's clean coffee certified to be free of 27 energy-sapping toxins, plus grass-fed butter and Bulletproof Brain Octane Oil—extracted from the most potent part of the coconut—to power your brain and body and give you steady, all day energy."

87.    Mrs. Altes, on at least one occasion, would not have purchased Bulletproof Cold Brew Coffee absent these misleading claims, and never would have purchased Bulletproof had she known it was misbranded, deceptively marketed, an unapproved new drug, and sold in violation of California and federal law.

## XVI.  CLASS ACTION ALLEGATIONS

88.    Plaintiff brings this action on behalf of herself and all others similarly situated (the "Class"), excluding Defendant's officers, directors, and employees, and the Court, their officers, and their families.

89.    The Class is defined as follows:

All citizens of California who purchased Bulletproof Cold Brew Coffee products in California from May 21, 2015 to the time when class notice is issued.

90.    Questions of law and fact common to Plaintiff and the Classes include:

- Whether Defendant's conduct constitutes a violation of the California Consumer Legal Remedies Act;
- Whether Defendant's conduct constitutes a violation of the unlawful prong of California's Unfair Competition Law;
- Whether Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers;
- Whether the slight utility Defendant realizes as a result of its conduct outweighs

the gravity of the harm the conduct causes to their victims;

- Whether Defendant's conduct violated public policy as declared by specific constitutional, statutory, or regulatory provisions;

- Whether the Bulletproof Cold Brew products are unapproved new drugs;

- Whether the product label fails to comply with FDA regulations;

- Whether Defendant fraudulently omitted material information in advertising Bulletproof Cold Brew Coffee as safe and effective;

- Whether Defendant sold and distributed Bulletproof Cold Brew Coffee to the public in packaging that was false, at variance with the truth, or likely to deceive reasonable consumer;

- Whether the Class is entitled to actual damages, restitution, punitive damages, fees and costs, and injunctive relief;

- Whether Defendant's conduct was knowing, or whether Defendant reasonably should have known of the conduct;

- Whether Defendant acted willfully, recklessly, negligently, or with gross negligence in violation of the law as alleged herein; and

- Whether the injury to consumers from Defendant's practices is substantial;

91.    By purchasing the Bulletproof Cold Brew products, all Class members were subjected to the same wrongful conduct and the same economic injury.

92.    Plaintiff will fairly and adequately protect the interests of the Class, has no interests that are incompatible with the interests of the Class, and has retained counsel competent and experienced in class litigation.

93.    The Class is sufficiently numerous, as it includes thousands of individuals who purchased Bulletproof Cold Brew products throughout California during the Class Period.

94.    The relief sought for each Class member is small. Absent the availability of class action procedures, it would be infeasible for Class members to redress the wrongs

26

1 | done to them.

2 |    95. Defendant has acted on grounds applicable to the Class, thereby making

3 | final injunctive relief or declaratory relief appropriate concerning the Class as a whole.

4 | ### XVII. CAUSES OF ACTION

5 | **First Cause of Action**

6 | **Unfair Competition Law, Bus. & Prof. Code §§ 17200 *et seq.***

7 |    96. In this and every cause of action, Plaintiff realleges and incorporates by

8 | reference each and every allegation contained elsewhere in this Complaint, as if fully set

9 | forth herein.

10 |    97. Defendant's conduct described here is unfair because it is

11 | •  immoral, unethical, unscrupulous, and offends public policy;

12 | •  the gravity of its conduct outweighs any benefit; and

13 | •  the injury to consumers is substantial, not outweighed by any countervailing

14 |   benefits to competition, and not one that consumers themselves could

15 |   reasonably have avoided.

16 |    98. Defendant's conduct is "unlawful" because it violated the following portions

17 | of the Food, Drug, and Cosmetic Act:

18 | •  21 U.S.C. § 331(a), prohibiting the "introduction or delivery for introduction into

19 |   interstate commerce of any food, drug, device, tobacco product, or cosmetic that is

20 |   adulterated or misbranded";

21 | •  21 U.S.C. § 331(b), prohibiting the "adulteration or misbranding of any food, drug,

22 |   device, tobacco product, or cosmetic in interstate commerce";

23 | •  21 U.S.C. § 355(a), prohibiting the sale of unapproved new drugs.

24 |    99. Defendant's conduct is further "unlawful" because Defendant made a

25 | "health claim" as defined by 21 C.F.R. § 101.14(a) despite containing a disqualifying

26 | level of saturated fat pursuant to 21 C.F.R. § 101.14(d) and failing to meet any of the

27 | exceptions identified in 21 C.F.R. § 101.14(e).

28 |

27

100.   Bulletproof also violates 21 C.F.R. § 101.60 because the Bulletproof Cold Brew Coffee products contain the nutrient content claim "0g Sugar," but they do not meet the requirements set forth in 21 C.F.R. § 101.60(c)(2)(i), (ii), or (iii).

101.   Specifically, the Bulletproof Coffee Cold Brew products were required to, but do not, bear the phrase "not a reduced calorie food," "not a low calorie food," or "not for weight control" immediately after the "0g Sugar" claim.

102.   Further, Bulletproof 360 violates 21 C.F.R. § 101.13 because the packaging of the Bulletproof Cold Brew Coffee products bears a nutrient content claim, "0g Sugar," and the products "contain[] more than 13.0 g of fat, 4.0 g of saturated fat, 60 milligrams (mg) of cholesterol, or 480 mg of sodium . . . per labeled serving," but do not bear a statement disclosing that the nutrient exceeding the specified level is present in the food as follows: 'See nutrition information for _____ content' with the blank filled in with the identity of the nutrient exceeding the specified level, e.g., 'See nutrition information for fat content.'" 21 C.F.R. § 101.13(h)(1).

103.   Defendant's conduct also violates other provisions of California law including, *inter alia*:

- Health & Safety Code § 110100 et seq., which adopts all FDA regulations as state regulations;

- *Id.* § 110398, "It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded";

- *Id.* §§ 111330, 111440, 111445, 111450, prohibiting manufacture, distribution, and sale of misbranded drugs;

- *Id.* §§ 110660, 110765, 110770, prohibiting manufacture, distribution, and sale of misbranded food;

- *Id.* § 111550, prohibiting sale of new drug unless approved under 21 U.S.C. § 355;

- Civil Code § 1770(a), prohibiting misleading practices in relation to the sale of goods; and

28

- Bus. & Prof. Code § 17200 *et seq*., prohibiting fraudulent business activity.

104.   The acts, omissions, misrepresentations, practices, and non-disclosures of Defendant as alleged herein constitute "fraudulent" business acts and practices in that Defendant's conduct has a likelihood, capacity or tendency to deceive Plaintiff, the Class, and the general public.

105.   In accordance with Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Defendant from continuing to conduct business through unfair, unlawful, and fraudulent acts and practices and to commence a corrective advertising campaign; requiring Defendant to commence a corrective advertising campaign; and awarding restitution of all monies from the sale of the Bulletproof Cold Brew products in an amount of $15 million or a greater amount to be proved at trial.

### Second Cause of Action

### Consumer Legal Remedies Act, Civil Code §§ 1750 *et seq.*

106.   The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

107.   Defendant's policies, acts and practices were designed to, and did, result in the purchase and use of the Bulletproof Cold Brew products primarily for personal, family, or household purposes, and violated and continue to violate the following sections of the CLRA:

a.   § 1770(a)(3), misrepresenting the affiliation, connection with, or association with, or certification by, another;

b.   § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

c.   § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

d.   § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

e.   § 1770(a)(16): representing the subject of a transaction has been supplied in

29

1    accordance with a previous representation when it has not.

2        108.   As a result, Plaintiff and the Class have suffered irreparable harm and are

3    entitled to injunctive relief and restitution.

4        109.   As a further result, Plaintiff and the Class have suffered damages, and

5    because the conduct was deliberate, immoral, oppressive, made with malice and/or

6    contrary to public policy, they are entitled to punitive or exemplary damages.

7        110.   In compliance with Civ. Code § 1782, Plaintiff sent Defendant written notice

8    of her claims on April 11, 2019. Defendant received Plaintiff's written notice on April

9    15, 2019 and replied on May 8, 2019. Pursuant to section 1782 *et seq*. of the CLRA,

10   Plaintiff notified Defendant in writing by certified mail of the particular violations of §

11   1770 of the Act as to the Bulletproof Cold Brew products and demanded that Defendant

12   rectify the problems associated with the actions detailed above and give notice to all

13   affected consumers of its intent to so act.

14       111.   Defendant's wrongful business practices regarding the Bulletproof Cold

15   Brew products constituted, and constitute, a continuing course of conduct in violation of

16   the CLRA since Defendant is still representing that the Bulletproof Cold Brew products

17   have characteristics, uses, benefits, and abilities which are false and misleading, and have

18   injured Plaintiff and the Class.

19                    **XVIII.    PRAYER FOR RELIEF**

20       WHEREFORE, Plaintiff, on behalf of herself, all others similarly situated, and the

21   general public, prays for judgment against Defendant as follows:

22   A.    A preliminary and final injunction prohibiting all of Defendant's ongoing

23         illegal conduct;

24   B.    An order confirming that this class action is properly maintainable as a class

25         action as defined above, appointing Mrs. Altes and her undersigned counsel to

26         represent the Class, and requiring Defendant to bear the cost of class notice;

27   C.    An order requiring Defendant to pay restitution to Plaintiff and class members

28         of $15,000,000, or such greater amount to be determined at trial;

30

D.    An award of actual and punitive damages to the extent allowable by law in an amount to be proved at trial;

E.    A corrective advertising campaign;

F.    Pre-judgment and post-judgment interest;

G.    Attorney fees and costs; and

H.    Such other and further relief as this Court may deem just, equitable or proper.

## XIX.  JURY DEMAND

Plaintiff requests a trial by jury.

DATED: August 5, 2019                    Respectfully Submitted,


s/ Gregory S. Weston
**THE WESTON FIRM**
GREGORY S. WESTON
1405 Morena Blvd., Suite 201
San Diego, CA 92110
Telephone:   (619) 798-2006
Facsimile:    (619) 343-2789

**Counsel for Plaintiff**

31

# EXHIBIT 1

# ALV Supplement Direct 3/3/16

 **Department of Health and Human Services**

Public Health Service
Food and Drug Administration
Minneapolis District Office
Central Region
250 Marquette Avenue, Suite 600
Minneapolis, MN 55401
Telephone: (612) 334-4100
FAX: (612) 334-4142

March 3, 2016

**WARNING LETTER**

**Via UPS Overnight Delivery**

**Refer to MIN 16 - 08**

Timothy Meyer
alvSupplement Direct
dba TJM Resale's Synaptik Supplements & Ligand Solutions
5 Heron Lane
Saint Paul, Minnesota 55127

Dear Mr. Meyer:

This letter is to advise you that in June 2015 the U.S. Food and Drug Administration (FDA) reviewed the label for your "Anhydrous Caffeine Bulk Powder" product. In January 2016 the FDA reviewed your website at the internet address *www.alvSupplementdirect.com* (which redirects to *www.synaptiksupplements.com*) and has determined that you take orders there for the product "Anhydrous Caffeine Bulk Powder." This product is offered in powdered form, and its label lists "pure Caffeine powder >99%" as the sole ingredient. The claims on your website establish that "Anhydrous Caffeine Bulk Powder" is a drug under section 201(g)(1)(C) of the Federal Food, Drug, and Cosmetic Act (the Act), 21 U.S.C. § 321(g)(1)(C), because it is intended to affect the structure or any function of the body. As explained further below, introducing or delivering this product for introduction into interstate commerce for such uses violates the Act. You can find the Act and FDA regulations through links on FDA's home page at *www.fda.gov*.

**Unapproved New Drug**

Based on our review, we have determined that the claims on your website promote this product for conditions that cause it to be a drug under section 201(g)(1)(C) of the Act, 21 U.S.C. § 321(g)(1)(C), because it is an article (other than food) intended to affect the structure or any function of the body. The intended use of a product may be determined by, among other things, its labeling, advertising, and the circumstances surrounding its distribution. *See, e.g.*, Title 21, Code of Federal Regulations, section 201.128 (21 CFR 201.128).

The claims observed on your website w*ww.alvSupplementdirect.com*, indicating that "Anhydrous Caffeine Bulk Powder" is intended to affect the structure or any function of the body include, but may not be limited to, the following:

- "Whether you just need that extra pick-me-up to get your day going or boosting your energy for work or fitness, Pure [sic] caffeine will do the trick."
- "It can be helpful as a fat-burner in that it speeds up your metabolism making you more active, and as an effective appetite suppressant…"
- "…also increase focus…."

The above-mentioned claims cause your product "Anhydrous Caffeine Bulk Powder" to be a drug under section 201(g)(1)(C) of the Act, 21 U.S.C. § 321(g)(1)(C). Furthermore, this product is a "new drug," as defined by section 201(p) of the Act, 21 U.S.C. § 321(p), because its composition is such that it is not generally recognized as safe and effective for use under the conditions prescribed, recommended, or suggested in its labeling.

Under sections 301(d) and 505(a) of the Act, 21 U.S.C. §§ 331(d) and 355(a), a new drug may not be introduced or delivered for introduction into interstate commerce unless an FDA-approved application is in effect for it. There is no FDA-approved application in effect for your "Anhydrous Caffeine Bulk Powder" product. Consequently, your marketing and sale of this product violates these provisions of the Act.

**Misbranded Drug**

In addition, "Anhydrous Caffeine Bulk Powder" is a misbranded drug under section 502(f)(1) of the Act, 21 U.S.C. § 352(f)(1).

A drug is misbranded under section 502(f)(1) of the Act, 21 U.S.C. § 352(f)(1), if the drug fails to bear adequate directions for its intended use(s). "Adequate directions for use" means directions under which a layperson can use a drug safely and for the purposes for which it is intended, 21 CFR 201.5. As discussed below, there is a potential for serious adverse events associated with the use of this product.

"Anhydrous Caffeine Bulk Powder" is misbranded under section 502(f)(1) of the Act,  21 U.S.C. § 352(f)(1), because the product labeling does not contain sufficient information to enable laypersons to use this product safely and for the purposes for which it is intended (described above), including:  frequency of administration, duration of administration, time of administration, route or method of administration, and preparation for use.[1] Moreover, any such information would not provide adequate directions for use, given that consumers are unlikely to have a measuring tool to accurately measure an appropriate serving size for this product.[2] (*See* 21 CFR 201.5.) The introduction or delivery for introduction into interstate commerce of this misbranded drug violates section 301(a) of the Act, 21 U.S.C. § 331(a).  (*See* 21 CFR 201.5(c), (d), (e), (f) and (g).)

**Adulterated Dietary Supplement**

Your product is not labeled as a dietary supplement, and it therefore does not meet the definition of a dietary supplement.  *See* section 201(ff)(2)(C) of the Act, 21 U.S.C. § 321(ff)(2)(C).  However, we note that your product label prominently bears the name of your website *alvSupplementdirect.com* which contains the word "supplement."  We also note that your website contains a statement that closely resembles the statement required under section 403(r)(6)(C) of the Act, 21 U.S.C. § 343(r)(6)(C), for dietary supplements that make certain labeling claims.  Based on your use of this statement and the name of your website, it appears you may intend to market your product as a dietary supplement.  If you were to market your product in such a way as to meet the definition of a dietary supplement, it would be adulterated under section 402(f)(1)(A)(i) of the Act, 21 U.S.C. § 342(f)(1)(A)(i), because it presents a significant or unreasonable risk of illness or injury under the conditions of use recommended or suggested in the labeling.

Your label states:  "Serving Size: 50mg-100mg."  Depending on the density of the powder, we estimate that a serving of 50 to 100 milligrams would be approximately 1/54[th] to 1/27[th] of a teaspoon.[3]  This amount cannot be accurately measured using common household measuring tools. Many consumers do not have a scale that is sufficiently precise to accurately measure such a small amount.

Caffeine is a powerful stimulant.  A single teaspoon of pure powdered caffeine is roughly equivalent to the amount in 28 cups of coffee (approximately 2.7 grams[4]).  Consuming as little as one teaspoon of caffeine has been associated with symptoms including nausea, vomiting, anxiety, and heart palpitations.  Consuming as little as one tablespoon (equivalent to 3 teaspoons or approximately 8.1 grams) of caffeine has been associated with symptoms including chest pain, hypokalemia, elevated blood glucose, tachycardia, bigeminy, agitation, respiratory alkalosis, irregular heartbeat, and in some cases, even death.

Your product consists of a package containing 50 grams (approximately 18 tablespoons) of powdered caffeine, which is 500-1,000 recommended servings of the product.  In light of the potential toxicity of your product, the fact that your product is packaged to contain an amount that would be lethal to many consumers, and the fact that the packaging requires the consumer to use a precise scale to separate out a safe serving from this potentially lethal amount, we have determined that your product presents a significant or unreasonable risk of illness or injury under the conditions of use recommended or suggested in the labeling. Therefore, as discussed above, if you were to market your product as a dietary supplement it would be adulterated under section 402(f)(1)(A)(i) of the Act, 21 U.S.C. § 342(f)(1)(A)(i).

We note that your product label states "For manufacturing purposes only, not for direct consumption," but this assertion is insufficient to overcome other representations that indicate that your product is intended for direct consumption by purchasers. For example, your product label contains a serving size that seems aimed at individual users.  Your product label also states "Not for use by those under 18 years," which is a statement that seems inapplicable to a powdered caffeine product that is only intended for manufacturing.  Furthermore, your website contains statements that indicate that the product is intended for direct consumption by individual consumers, such as "Whether you just need that extra pick-me-up to get your day going or boosting your energy for work or fitness, Pure [sic] caffeine will do the trick," and "increase focus if you are a College [sic] student and need to put in those all night cram sessions."

The above violations are not intended to be an all-inclusive list of violations that exist in connection with your products.  You are responsible for ensuring that all of your products are in compliance with the Act and all applicable FDA regulations.

You should take prompt action to correct the violations cited above and to prevent their reoccurrence. Failure to do so may result in legal action without further notice, including seizure and/or injunction.

Please respond in writing within 15 working days of receipt of this letter. Your response should outline the specific steps you have taken to correct these violations, including any steps taken with respect to product currently in the marketplace. Your response should also include an explanation of steps you have taken to ensure that similar violations do not recur, as well as documentation to support your response. If you cannot complete all corrections before you respond, you should explain the reason for your delay and state when you will correct any remaining violations.

Your written reply should be directed to Demetria Lueneburg, Compliance Officer, Food and Drug Administration, 250 Marquette Avenue, Suite 600, Minneapolis, Minnesota 55401. If you have any questions with regard to this letter, please contact Ms. Lueneburg at (612) 758-7210 or demetria.lueneburg@fda.hhs.gov.

Sincerely,
/S/
Michael Dutcher, DVM
Director
Minneapolis District

---

[1] As noted below, the statements on your website and label indicate that your product is intended for use by consumers, notwithstanding that your label states "For manufacturing purposes only, not for direct consumption."
[2] We note below that a serving size of your product is estimated to be approximately 1/54th to 1/27th of a teaspoon.
[3] Due to the nature of producing a powdered crystalline substance, there may be differences in the density of different powdered caffeine products even when the products are the same chemical substance. Our reported values for a teaspoon and tablespoon of powdered caffeine are based on peer reviewed literature, which indicates that the poured bulk density of powdered caffeine is 0.55 g/mL; therefore, one standard teaspoon is 2.7 g and one standard tablespoon is 8.1 g.
[4] The USDA nutrition database reports that one cup (8 oz) of ground coffee contains 95 mg of caffeine (*http://ndb.nal.usda.gov/ndb/foods/show/4277*).

> **More in 2016**
> **(/ICECI/EnforcementActions/WarningLetters/2016/default.htm)**

# BrainAlert, LLC 12/14/17



Seattle District Office
22215 261h Avenue SE, Suite 210
Bothell, Washington 98021

December 14, 2017

**OVERNIGHT DELIVERY**
**SIGNATURE REQUIRED**

In reply, refer to: WL CMS 535653

Jared K. Lykken, Distributing Agent
BrainAlert, LLC
3116 164th Street SW, Unit #1106
Lynnwood, Washington 98087

**WARNING LETTER**

Dear Mr. Lykken:

The United States Food and Drug Administration (FDA) conducted an inspection of your facility, located at 3116 164th Street SW, Unit #1106, Lynnwood, Washington, June 19 and 20, 2017, and July 12, 2017. The inspection revealed serious violations of the Current Good Manufacturing Practice in Manufacturing, Packaging, Labeling, or Holding Operations for Dietary Supplements regulation, Title 21, Code of Federal Regulations (CFR), Part 111 (21 CFR Part 111). These violations cause your BrainAlert product to be adulterated within the meaning of section 402(g)(1) of the Federal Food, Drug, and Cosmetic Act (the Act) [21 U.S.C. § 342(g)(1)] in that it has been prepared, packed, or held under conditions that do not meet CGMP requirements for dietary supplements.

In addition, FDA reviewed your website at www.brainalert.com. Based on our review, we have concluded that your BrainAlert product is an unapproved new drug and misbranded drug and that, even if it were not a drug, it would be a misbranded dietary supplement, as explained further below. You may find the Act and FDA regulations through links on the FDA's home page at **www.fda.gov (http://www.fda.gov/)**.

**Unapproved New Drugs/Misbranded Drugs**

FDA reviewed your website www.brainalert.com in August 2017 and again in December 2017 and determined that you take orders there for your product BrainAlert. The claims on your website establish that the product is a drug under section 201(g)(1)(B) of the Act [21 U.S.C. § 321(g)(1)(B)] because it is intended for use in the cure, mitigation, treatment, or prevention of disease. As explained further below, introducing or delivering this product for introduction into interstate commerce for such uses violates the Act.

Examples of some of the claims that provide evidence that your product is intended for use as drugs are listed below. This includes claims made about the ingredients present in BrainAlert (i.e., DMAE, Gotu Kola, huperzine A, and Vitamin B3 Niacinamide).

- "Are you struggling with … Seasonal depression? … Then BrainAlert is the solution for you!"

- "DMAE was used to help ADD children in the 1980's, which studies showing improvement in memory, concentration, and the ability to focus."

- "Traditionally, gotu kola has been used to treat anxiety …"

- "Huperzine A … be more effective and selective than tacrine, a pharmaceutical drug, at inhibiting cholinesterase."

- "Vitamin B3 Niacinamide … Studies have shown niacinamide to product an anti-anxiety effect."

In addition, when scientific publications or references are used commercially by the seller of a product to promote the product to consumers, such references may become evidence of the product's intended use. For example, under 21 CFR 101.93(g)(2)(iv)(C), a citation of a publication or reference in the labeling of a product is considered to be a claim about disease treatment or prevention if the citation refers to a disease use and if, in the context of the labeling as a whole, the citation implies treatment or prevention of a disease. The following are examples of citations as listed on your website used to market BrainAlert for disease treatment and prevention and are thus evidence of your product's intended use as a drug:

- "Schonheit K, Gille L, Nohl H, Institute of Pharmacology and Toxicology, Veterinary University of Vienna, Austria. Effect of alpha-lipoic acid and dihydrolipoic acid on ischemia/reperfusion injury of the heart and heart mitochondria. Biochim Biophys Acta 1995 Jun 9;1271(2-3):335-42."

- "Salvioli G, Neri M. L-acetylcarnitine treatment of mental decline in the elderly. Drugs Exp Clin Res 1994;20(4):169-76."

- "Mortensen SA, Vadhanavikit S, Baandrup U, Folkers K. Long-term coenzyme Q10 therapy: a major advance in the management of resistant myocardial failure. Drug Exptl Clin Res 1985;11:581-93."

- "Soja AM, Mortensen SA. Treatment of chronic cardiac insufficiency with coenzyme Q10, results of meta-analysis in controlled clinical trials. Ugeskr Laeger 1997;159:7302"

- "Shults CW, Oakes D, Kieburtz K, Beal F, Haas R, Plumb S, Juncos JL, Nutt J, Shoulson I, Carter J, Kompoliti K, Perlmutter JS, Reich S, Stern M, Watts RL, Kurlan R, Molho E, Harrison M, Lew M, and the Parkinson Study Group. "Effects of coenzyme Q10 in early Parkinson disease: evidence of slowing of the functional decline." Archives of Neurology , October 2002, Vol. 59, No. 10, pp. 1541-1550."

- "Birks J, Grimley Evans J, Van Dongen M. Ginkgo Biloba for Cognitive Impairment and Dementia (Cochrane Review). In: The Cochrane Library, Issue 4, 2002. Oxford: Update Software"

- "Ved HS, Koenig ML, Dave JR, et al. Huperzine A, a potential therapeutic agent for dementia, reduces neuronal cell death caused by glutamate. Neuroreport. 1997;8:963-968."

- "Gelenberg AJ, Gibson CJ, Wojcik JD. Neurotransmitter precursors for the treatment of depression. Psychopharmacol Bull 1982;18:7-18."

- "Yun TK, Choi SY. Non-organ specific cancer prevention of ginseng: a prospective study in Korea. Int J Epidemiol 1998;27:359-64."

- "Elliott RB, Pilcher CC, Fergusson DM, et al. A population based strategy to prevent insulin-dependent diabetes using nicotinamide. J Pediatr Endocrinol Metab. 1996;9:501-509."

- "Polo V, Saibene A, Pontiroli AE. Nicotinamide improves insulin secretion and metabolic control in lean type 2 diabetic patients with secondary failure to sulphonylureas. Acta Diabetol. 1998;35:61-64."

- "Jonas WB, Rapoza CP, Blair WF. The effect of niacinamide on osteoarthritis: a pilot study. Inflamm Res. 1996;45:330-334."

- "Anand JC. Osteoarthritis and pantothenic acid. Journal of the College of General Practice 5:136-7, 1963."

- "Malouf M, Grimley EJ, Areosa SA. Folic acid with or without vitamin B12 for cognition and dementia. Cochrane Database Syst Rev. 2003;(4):CD004514."

Your product BrainAlert is not generally recognized as safe and effective for the above referenced uses and, therefore, is a "new drug" under section 201(p) of the Act [21 U.S.C. § 321(p)]. New drugs may not be legally introduced or delivered for introduction into interstate commerce without prior approval from FDA, as described in sections 301(d) and 505(a) of the Act [21 U.S.C. §§ 331(d) and 355(a)]. FDA approves a new drug on the basis of scientific data submitted by a drug sponsor to demonstrate that the drug is safe and effective.

A drug is misbranded under section 502(f)(1) of the Act [21 U.S.C. § 352(f)(1)] if the drug fails to bear adequate directions for its intended use(s). "Adequate directions for use" means directions under which a layperson can use a drug safely and for the purposes for which it is intended (21 CFR 201.5). Prescription drugs, as defined in section 503(b)(1)(A) of the Act [21 U.S.C. § 353(b)(1)(A)], can only be used safely at the direction, and under the supervision, of a licensed practitioner.

Your product BrainAlert is intended for treatment of one or more diseases or conditions that are not amenable to self-diagnosis or treatment without the supervision of a licensed practitioner. Therefore, it is impossible to write adequate directions for a layperson to use your product safely for its intended purposes. Accordingly, BrainAlert fails to bear adequate directions for its intended use and, therefore, the product is misbranded under section 502(f)(1) of the Act [21 U.S.C. § 352(f)(1)]. The introduction or delivery for introduction into interstate commerce of this misbranded drug violates section 301(a) of the Act [21 U.S.C. § 331(a)].

**Adulterated Dietary Supplements**

Even if your product labeling did not contain claims that render the product an unapproved new drug and misbranded drug, your product BrainAlert would be adulterated under section 402(g)(1) of the Act [21 U.S.C. § 342(g)(1)] because it has been prepared, packed, or held under conditions that do not meet CGMP requirements for dietary supplements. During the inspection, our investigator observed the following violations of the FDA's Current Good Manufacturing Practice (CGMP) requirements for dietary supplements:

1.   You failed to implement a system of production and process controls that covers all stages of manufacturing, packaging, labeling, and holding of the dietary supplement to ensure the quality of the dietary supplement and that the dietary supplement is packaged and labeled as specified in the master

manufacturing record, as required by 21 CFR 111.55. During our inspection, you informed our investigator that your firm receives finished, packaged, and labeled dietary supplements that your contract manufacturer manufactures, packages, and labels under your own firm's name, and that you hold and distribute the dietary supplement. However, you have not established a system of production and process controls to ensure the quality of the dietary supplement and that the dietary supplement is packaged and labeled according to established specifications. For example, you stated that you have no knowledge of how your contract manufacturer manufactures or handles your product prior to your receipt of the finished product, or whether your contract manufacturer conducts any testing of the product.

As a distributor that contracts with other manufacturers to manufacture, package, or label dietary supplements that your firm releases for distribution under your firm's name, your firm has an obligation to know what and how manufacturing, packaging, and/or labeling activities are performed so that you can make decisions related to whether your dietary supplement products conform to established specifications and whether to approve and release the products for distribution [72 Fed. Reg. 34752, 34790 (Jun. 25, 2007)]. Your firm introduces or delivers, or causes the introduction or delivery, of the dietary supplement into interstate commerce in its final form for distribution to consumers. As such, your firm has an overarching and ultimate responsibility to ensure that all phases of the production of that product are in compliance with dietary supplement CGMP requirements.

Although a firm may contract out certain dietary supplement manufacturing, packaging, and/or labeling operations, it cannot contract out its ultimate responsibility to ensure that the dietary supplement it places into commerce (or causes to be placed into commerce) is not adulterated for failure to comply with dietary supplement CGMP requirements [see *United States v. Dotterweich*, 320 U.S. 277, 284 (1943) (explaining that an offense can be committed under the Act by anyone who has "a responsible share in the furtherance of the transaction which the statute outlaws"); *United States v. Park*, 421 U.S. 658, 672 (1975) (holding that criminal liability under the Act does not turn on awareness of wrongdoing, and that "agents vested with the responsibility, and power commensurate with that responsibility, to devise whatever measures are necessary to ensure compliance with the Act" can be held accountable for violations of the Act)]. In particular, the Act prohibits a person from introducing or delivering for introduction, or causing the delivery or introduction, into interstate commerce a dietary supplement that is adulterated under section 402(g) for failure to comply with dietary supplement CGMP requirements [see 21 U.S.C. §§ 342(g) and 331(a)]. Thus, a firm that contracts with other firms to conduct certain dietary supplement manufacturing, packaging, and labeling operations for it is responsible for ensuring that the product is not adulterated for failure to comply with dietary supplement CGMP requirements, regardless of who actually performs the dietary supplement CGMP operations.

2.    Your firm failed to make and keep written procedures for the responsibilities of the quality control operations, including written procedures for conducting a material review and making a disposition decision, as required by 21 CFR 111.103 and 21 CFR 111.140(b). Specifically, you have no written procedures for the responsibilities of the quality control operations.

To fulfill requirements for quality control operations, quality control personnel must ensure that the manufacturing, packaging, labeling, and holding operations ensure the quality of the dietary supplement and that the dietary supplement is packaged and labeled as specified in the master manufacturing record (21 CFR 111.105). Further, you must have documentation of the written procedures for the responsibilities of the quality control operations, including procedures for conducting a material review and making a disposition decision, and written documentation that quality control personnel performed review, approval, or rejection requirements, at the time of performance, for any packaged and labeled dietary supplement you distribute [21 CFR 111.127(h) and 111.140(b)].

3.    You failed to establish and follow written procedures to fulfill the requirements related to product complaints, as required by 21 CFR 111.553.  Specifically, you have not established written procedures for handling product complaints.

**Misbranded Dietary Supplement**

Your BrainAlert product is misbranded within the meaning of section 403(s)(2)(C) of the Act [21 U.S.C. § 343(s)(2)(C)] because the label fails to identify the part of the plant (e.g., root, leaves) from which each botanical dietary ingredient, i.e. Ginseng (Panax), Rhodiola rosea, Ginkgo Biloba, and Gotu Kola, in the product is derived, as required by 21 CFR 101.4(h)(1).

In accordance with 21 CFR 101.3(d), the statement of identity for a food in packaged form shall be presented in bold type on the principal display panel, shall be in a size reasonably related to the most prominent printed matter on such panel, and shall be in lines generally parallel to the base on which the package rests as it is designed to be displayed.  The statement of identity of "DIETARY SUPPLEMENT" is not presented as such.

Your BrainAlert product is misbranded within the meaning of section 403(q)(5)(F) of the Act [21 U.S.C.§ 343(q)(5)(F)] in that the presentation of the nutrition information on the labeling does not comply with 21 CFR 101.36. For example,

- Your BrainAlert product incorrectly lists in the Supplement Facts label thiamin and riboflavin in relation to the synonyms for these dietary ingredients. The synonyms should be placed in parentheses immediately following the name of the dietary ingredient per 21 CFR 101.9(c)(8)(v) and 21 CFR 101.36(b)(2).
- Your BrainAlert product declares vitamin B3 which is not the nomenclature for niacin specified in 21 CFR 101.9 or 101.36(b)(2)(i)(B).
- Your BrainAlert % Daily Value for thiamin HCl is incorrect. The % Daily Value should be rounded to the nearest whole percent per 21 CFR 101.36(b)(2)(iii)(C).

Your website includes the statement, "Our product is made … in a FDA approved facility in the United States (USA) … " FDA does not approve dietary supplement manufacturing facilities. Therefore, this statement is false or misleading and causes your dietary supplement product BrainAlert to be misbranded under section 403(a)(1) of the Act.

This letter is not intended to be an all-inclusive list of violations at your facility or in connection with your products. It is your responsibility to ensure that your products comply with all applicable statutes and regulations, including the Act and FDA's implementing regulations. You should take prompt action to correct the violations cited in this letter. Failure to promptly correct these violations may result in regulatory action without further notice, including, without limitation, seizure and injunction.

Please notify this office in writing within fifteen (15) business days from your receipt of this letter as to the specific steps you have taken to correct the violations noted above and to ensure that similar violations do not occur in the future. Your response should include any documentation necessary to show that correction has been achieved. If you cannot complete all corrections before you respond, state the reason for the delay and the date by which you will complete the corrections.

Section 743 of the Act [21 U.S.C. § 379j-31] authorizes FDA to assess and collect fees to cover FDA's costs for certain activities, including reinspection-related costs. A reinspection is one or more inspections conducted subsequent to an inspection that identified non-compliance materially related to a food safety

requirement of the Act, specifically to determine whether compliance has been achieved. Reinspection-related costs means all expenses, including administrative expenses, incurred in connection with FDA's arranging, conducting, and evaluating the results of the reinspection and assessing and collecting the reinspection fees [21 U.S.C. § 379j-31(a)(2)(B)]. For a domestic facility, FDA will assess and collect fees for reinspection-related costs from the responsible party for the domestic facility. The inspection noted in this letter identified non-compliance materially related to a food safety requirement of the Act. Accordingly, FDA may assess fees to cover any reinspection-related costs.

Please send your reply to the Food and Drug Administration, Seattle District Office, 22215 26th Avenue SE, Suite 210, Bothell, Washington, 98021, to the attention of Jessica L. Kocian, Compliance Officer. If you have any questions concerning this letter, you can contact Compliance Officer Jessica Kocian at (425) 302-0444.

Sincerely,
/S/
Miriam R. Burbach
District Director
Program Division Director


cc: Washington State Department of Agriculture
    Food Safety Program
    P.O. Box 42560
    Olympia, Washington 98504-2560

**Close Out Letter**

- **BrainAlert, LLC - Close Out Letter 4/27/18 (/ICECI/EnforcementActions/WarningLetters/2017/ucm606904.htm)**

**More in 2017 (/ICECI/EnforcementActions/WarningLetters/2017/default.htm)**

# GnuPharma Corp. 12/13/17



Office of Human & Animal Food
Operations West, Division 3
4040 N. Central Expressway, Suite 300
Dallas, Texas 75204

December 13, 2017

2018-DAL-WL-04

**WARNING LETTER**

**UPS Overnight**

Charles "Chip" W. Paul, President
Cynthia J. Paul, Co-Founder
GnuPharma Corporation
8751 North 117th East Avenue, Suite J
Owasso, Oklahoma 74055

Mr. and Ms. Paul:

From April 11 through April 13, 2017, the U.S. Food and Drug Administration (FDA) inspected your facility, located at 8751 North 117th East Avenue, Suite J, Owasso, Oklahoma. During the inspection, our investigators found violations of the Current Good Manufacturing Practice (CGMP) in Manufacturing, Packaging, Labeling, or Holding Operations for Dietary Supplements regulation, Title 21, Code of Federal Regulations Part 111 (21 CFR Part 111). These violations cause your GnuPharma products to be adulterated within the meaning of section 402(g)(1) of the Federal Food, Drug, and Cosmetic Act (the Act) [21 U.S.C. § 342(g)(1)] in that they have been prepared, packed, or held under insanitary conditions that do not meet CGMP regulations for dietary supplements found under 21 CFR Part 111.

We have also reviewed your GnuPharma Corporation websites, www.gnupharma.com and www.gnuwellness.com in June 2017 and again in November 2017, and the product labels for the products you manufacture and distribute. Based on our review, we have concluded that your Relief capsules, Foundation capsules, Aller-geez capsules, Fit capsules, Aller-Geez Tea, Foundation herbal tea, Relief

Tea, Relief Herbal Aromatherapy, and your HNR (all flavors) Herbal Aromatherapy are in violation of section 505(a) of the Act [21 U.S.C. §§ 355(a)].

We have also reviewed the product labels for your Relief, Foundation, Fit, and Sleep capsules, and based on our review, we have concluded that these products are misbranded within the meaning of section 403 of the Act [21 U.S.C. § 343].

We acknowledge receipt of your two written responses to the FDA 483, Inspectional Observations, dated April 25, 2017, and June 6, 2017, which outline your proposed corrective actions, including removing content from your websites and submitting copies of your new quality control procedures. However, a review of your websites and your corrective actions revealed adequate corrections have not been made, as outlined below.

You can find the Act and FDA regulations through links in FDA's website at **www.fda.gov (http://www.fda.gov/)**.

## Unapproved New Drugs

The Food and Drug Administration (FDA) reviewed your product labels and your website at the internet addresses www.gnuwellness.com and www.gnupharma.com in June 2017 and again in November 2017, and determined that you take orders there for your products Relief capsules, Foundation capsules, Aller-geez capsules, Fit capsules, Aller-Geez Tea, Foundation herbal tea, Relief Tea, Relief Herbal Aromatherapy, and HNR (all flavors) Herbal Aromatherapy.  The claims on your product labeling establish that the products are drugs under section 201(g)(1) of the Federal Food, Drug, and Cosmetic Act (the Act) [21 U.S.C. § 321(g)(1)] because they are intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease, and/or they are intended to affect the structure or any function of the body of man. As explained further below, introducing or delivering these products for introduction into interstate commerce for such uses violates the Act.

Examples of some of the claims on your product labeling that provide evidence that your products are intended for use as drugs include:

Relief capsules:

- Product label collected during the inspection: "assists with daily pain"

- Website www.gnuwellness.com: "nutritionally provides relief from occasional aches and pains."

Foundation capsules:

- Product label collected during the inspection: "assists with inflammation"

- Website https://gnupharma.com: "you may have an autoimmune disease….the root cause is a disruption in your Endocannabinoid System… [ECS]…the ECS can be influenced by a variety of herbs…we developed our Foundation product line to serve as daily nourishment for a healthy ECS…." and, "our products are designed to provide overall natural allergy relief…containing herbal decongestants and antihistamines…our team would love to get you on the path to optimal health and wellness with our Foundation and Allergy products"

Aller-geez capsules:

- The name of the product, "Aller-geez"

- Website www.gnupharma.com: "natural way to provide relief from occasional itchy nose, watery, eyes, and occasional sneezing"
- "allergy"
- "decongestant"

Fit capsules:

- Website www.gnuwellness.com: "if your appetite is significantly increased….it could be a symptom of a serious illness, such as diabetes or hyperthyroidism. Mental health conditions, such as depression….can also lead to appetite changes…."
- "The GnuPharma model is based on our knowledge and research of the ECS (Endocannabinoid System) It is the daily need for plant based flavonoids that when depleted our bodies potentially bread down along our "weakest" genetic links resulting in inflammation – which in turn can lead to disease and pain….GnuPharma Fit provides the raw resources needed to bolster a health ECS."

Aller-Geez Tea:

- The name of the product, "Aller-Geez"
- Website www.gnuwellness.com: "provides relief from occasional itchy nose, watery eyes and sneezing"

Foundation herbal tea:

- Website www.gnuwellness.com:  "The GnuPharma model is based on our knowledge and research of the ECS (Endocannabinoid System) It is the daily need for plant based flavonoids that when depleted our bodies potentially break down along our "weakest" genetic links resulting in inflammation – which in turn can lead to disease and pain….GnuPharma Foundation provides the raw resources needed to bolster a health ECS."
- Website https://gnupharma.com: "you may have an autoimmune disease….the root cause is a disruption in your Endocannabinoid System… [ECS]…the ECS can be influenced by a variety of herbs…we developed our Foundation product line to serve as daily nourishment for a healthy ECS…." and "our products are designed to provide overall natural allergy relief…containing herbal decongestants and antihistamines…our team would love to get you on the path to optimal health and wellness with our Foundation and Allergy products…."

Relief Tea:

- Website www.gnuwellness.com: "designed to provide relief from occasional aches or pains…"

HNR Herbal Aromatherapy (all flavors):

- Product label collected during the inspection: "Assists With Cravings . . . Assists With Anxiety . . . Assists With Withdrawal"
- Website www.gnuwellness.com: "How does HNR™ work?  We support a healthy Endocannabinoid System (ECS). The ECS is directly and indirectly responsible for many functions and processes within the body. In particular, the ECS is the lead system and plays a strong role in both feeding and craving behaviors. Feeding craving behaviors are not only how we eat but at a more basic level, they are how our bodies as for resources. People who have addictions are experiencing their bodies craving a substance at a very basic and neurological level. And whether the addiction is food, drugs or other substances, the ECS manages those cravings.  Similar to when we are hungry, a resource need is

==signaled within the brain and we experience hunger pangs.== This is your body asking for resources… We are providing a nutritious alternative, and we believe much healthier, resources for the body."

Relief Herbal Aromatherapy:

- Product label: "Assists with Daily Pain . . . Assists with Anxiety . . . Boosts Immunity"

- Website www.gnuwellness.com: "What is ECS Inhalable Aromatherapy?  Our "ECS Inhalable Aromatherapy" (IAT) products are designed to aromatically compliment our capsule products, which are designed to support a healthy Endocannabinoid System (ECS).  The ECS is everyone's master regulatory system, which when given proper resources from plant based flavonoids, may help you feel better.  What is the Endocannabinoid System (ECS)?  The ECS is an internal set of lipids, receptors, and other chemical mediators that interface with every human system.  From the brain to every cell in the human body the ECS is involved.  The ECS interfaces heavily with the Central Nervous System and does, influence it.  It is involved with the hypothalamic signaling…Relief provides nutritional support to give you relief from occasional aches or pains.  Comfort, Ease, Renewal…Begins Here!"

Your products are not generally recognized as safe and effective for the above referenced uses and, therefore, the products are "new drugs" under section 201(p) of the Act [21 U.S.C. 321(p)]. New drugs may not be legally introduced or delivered for introduction into interstate commerce without prior approval from FDA, as described in sections 301(d) and 505(a) of the Act [21 U.S.C. 331(d), 355(a)]. FDA approves a new drug on the basis of scientific data and information demonstrating that the drug is safe and effective for its labeled uses.

**Adulterated Dietary Supplements**

Even if your Fit, Foundation, and Relief products did not have therapeutic claims which make them unapproved new drugs, these products and other dietary supplement products that you manufacture would be adulterated within the meaning of section 402(g)(1) of the Act [21 U.S.C. § 342(g)(1)] in that they have been prepared, packed, or held under conditions that do not meet the CGMP regulations for dietary supplements (21 CFR Part 111).

The following CGMP violations were observed during the inspection of your facility:

1.   You failed to establish a specification for any point, step, or stage in the manufacturing process where control is necessary to ensure the quality of the dietary supplement and that the dietary supplement is packaged and labeled as specified in the master manufacturing record, as required by 21 CFR 111.70(a). Specifications include those that must be established for components that you use in the manufacture of a dietary supplement (21 CFR 111.70(b)), for in-process production (21 CFR 111.70(c)), for dietary supplement labels and packaging (21 CFR 111.70(d)), and to ensure the quality of the dietary supplement (21 CFR 111.70(e)).  Specifically:

a.  You failed to establish the following required component specifications under 21 CFR 111.70 (b) for each component that you use in the manufacture of a dietary supplement:

- Identity specifications, as required by 21 CFR 111.70(b)(1);

- Component specifications that are necessary to ensure that specifications for the purity, strength, and composition of the dietary supplements manufactured using the components are met, as required by 21 CFR 111.70(b)(2); and

- Limits on those types of contamination that may adulterate or may lead to adulteration of the finished batch of the dietary supplement to ensure the quality of the dietary supplement, as required by 21 CFR

111.70(b)(3).

b.  You failed to establish in-process specifications for any point, step, or stage in the master manufacturing record where control is necessary to ensure that specifications are met for the identity, purity, strength, and composition of the dietary supplements, and, as necessary, for limits on those types of contamination that may adulterate or may lead to adulteration of the finished batch of the dietary supplement, as required by 21 CFR 111.70(c)(1).

c.  You failed to establish specifications for each dietary supplement that you manufacture for the identity, purity, strength, and composition of the finished batch of the dietary supplement, and for limits on those types of contamination that may adulterate, or that may lead to adulteration of, the finished batch of the dietary supplement to ensure the quality of the dietary supplement, as required by 21 CFR 111.70(e).

We have reviewed your responses dated April 25, 2017, and June 6, 2017.  In your April 25, 2017, response you provided a copy of the procedure for Receiving and Processing Raw Materials.  This response is inadequate because it is a written procedure which describes how you receive raw materials, sample, and stage until dispositioned.  It does not address the specifications that you have established for each component used in the manufacture of your dietary supplements.  Furthermore, your updated June 6, 2017, response states that you have developed a set of specifications that your herbs must adhere to; however, we are unable to evaluate the adequacy of your response because you did not provide copies of component specifications, nor did you provide evidence of having established in-process and finished product specifications.  We will evaluate the adequacy of your corrective action at our next inspection.

2.    You failed to establish and follow written procedures for quality control operations, as required by 21 CFR 111.103.  Specifically, you told our investigator that you did not establish and follow written procedures for quality control operations.  You also must implement quality control operations in your manufacturing, packaging, labeling, and holding operations for producing the dietary supplement to ensure the quality of the dietary supplement and that the dietary supplement is packaged and labeled as specified in the master manufacturing record, as required by 21 CFR 111.65.

We have reviewed your responses dated April 25, 2017, and June 6, 2017, and determined that they are inadequate.  In your April 25, 2017, response you provided a copy of "Procedure for Quality Control Operations," and in your June 6, 2017, response you state that all efforts in documenting your quality control procedures are complete.  As submitted, your "Procedure for Quality Control Operations" does not meet the requirements of 21 CFR 111.105 for quality control operations.  For example, your "Procedure for Quality Control Operations" does not include information about quality control personnel approving or rejecting all processes, specifications, written procedures, controls, tests, and examinations, and deviations from or modifications to them, that may affect the identity, purity, strength or composition of a dietary supplement [21 CFR 111.105(a)].

3.    You failed to prepare and follow a written master manufacturing record for each unique formulation of your dietary supplement products that you manufacture, and for each batch size, to ensure uniformity in the finished batch from batch to batch, as required by 21 CFR 111.205(a).  Specifically, you told our investigator that you did not have written master manufacturing records for your dietary supplement products.

We have reviewed your responses, dated April 25, 2017, and June 6, 2017. We are unable to evaluate the sufficiency of your responses because you failed to provide documentation that you have prepared a master manufacturing record for each unique formulation and batch size of your dietary supplement products.  Furthermore, even if we could evaluate the sufficiency of your responses with that

documentation, we find your April 25, 2017, response inadequate because you provided a master manufacturing record template that does not include all the required elements specified in 21 CFR 111.210. For example, it does not include a complete list of the components to be used as required under 21 CFR 111.210(b).

4.   You failed to prepare a batch production record every time you manufacture a batch of your dietary supplement products, as required by 21 CFR 111.255(a). Specifically, during the inspection, our investigators observed that you did not have batch production records for any batches of dietary supplements produced between March 2016 and April 2017.

We have reviewed your responses, dated April 25, 2017, and June 6, 2017.  In your updated June 6, 2017, response you state that data has been gathered to support batch records for March, July, and September 2016 batch builds; however, we are unable to evaluate the sufficiency of your response because you did not provide any documentation to support production of your dietary supplement products. We will evaluate the adequacy of your corrective actions at our next inspection.

5.   You failed to establish and follow written procedures for fulfilling the requirement for equipment and utensils under 21 CFR 111.25, including written procedures for calibrating, inspecting, and checking automated, mechanical, and electronic equipment, as required by 21 CFR 111.25(b); as well as written procedures for maintaining, cleaning, and sanitizing, as necessary, all equipment, utensils, and any other contact surfaces that are used to manufacture, package, label, or hold components or dietary supplements, as required by 21 CFR 111.25(c). Specifically, during the inspection, our investigators observed that you did not have written procedures for fulfilling the requirement for equipment and utensils under 21 CFR 111.25.

Further, you failed to make and keep records documenting any calibration, each time the calibration is performed, for instruments that you use in manufacturing or testing a component or dietary supplement, as required by 21 CFR 111.35(b)(3). Specifically, during the inspection our investigator observed that you did not have calibration records for the **(b)(4)** scale used to weigh dietary ingredients used in the manufacture of your dietary supplements.

You also failed to make and keep documentation of the date of use, maintenance, cleaning and sanitizing of equipment, as required by 21 CFR 111.35(b)(2). Specifically, during the inspection, our investigator observed that you did not have records indicating that you clean and sanitize equipment and utensils used in manufacturing, before the dietary supplements were produced.

We have reviewed your responses, dated April 25, 2017, and June 6, 2017.  You provided copies of "Procedure for Calibration Maintenance" and "Procedure for Procedure for Cleaning (Labs)" in your April 25, 2017, response.  We find your "Procedure for Calibration Maintenance" inadequate because it does not address how you perform **(b)(4)** calibrations, checks, and inspections of your automated, mechanical, and electronic equipment prior to use in the manufacture of your dietary supplements.  Additionally, you state in your updated April 6, 2017, response that the uncalibrated scale observed during the inspection has now been calibrated by a certified professional according to its product manual; however, we are unable to evaluate the sufficiency of this corrective action because you did not provide documentation to support that the scale is calibrated.  We will assess the adequacy of that corrective action at our next inspection.

Furthermore, we find your "Procedure for Cleaning (Labs)" inadequate because it does not address how you maintain, clean, and sanitize all equipment and utensils used in the manufacture of your dietary

supplements.  Your procedure is specific to the cleaning of general contact surfaces in your labs and does not include procedures for cleaning and sanitizing equipment and utensils.

**Misbranded Dietary Supplements**

Even if your GnuPharma Corporation websites and labels did not contain claims that cause some of your products to be unapproved new and misbranded drugs, they would still be misbranded foods under section 403 of the Act [21 U.S.C. § 343] in that the labels for these products do not comply with the labeling requirements in 21 CFR 101, as follows:

1.  Your Relief, Foundation, Fit, and Sleep products are misbranded within the meaning of section 403(i)(2) of the Act [21 U.S.C. § 343(i)(2)] in that the labels fail to declare all the common or usual names of each ingredient used as required by 21 CFR 101.36 and 21 CFR 101.4. For example:

- Your Relief, Foundation, Fit, and Sleep products are encapsulated, but the labels fail to list the capsule ingredients.  [21 CFR 101.4(g)]

- Your Relief and Sleep labels list an ingredient, "Red Sage Root Powder." According to the product formulations, the ingredient used is **(b)(4)**.  This ingredient must be listed using the Latin binomial name, or by the standardized common name listed in Herbs of Commerce, which is "red-rooted sage" in the 1992 ed., or "Chinese salvia" in the 2000 ed. [21 CFR 101.4(h)]

- Your Foundation label lists the ingredient shilajit, but that is not the common or usual name for the dietary ingredient.

2.   Your Fit product is misbranded within the meaning of section 403(s)(2)(A) of the Act [21 U.S.C. §343(s)(2)(A)] in that the label fails to list the name of each dietary ingredient of the supplement that is described in section 201(ff) of the Act and the quantity of each such dietary ingredient.  According to the formulation you provided during the inspection, your Fit product contains the ingredients **(b)(4)** and **(b)(4)**.  The product label you provided during the inspection does not list these botanical ingredients.  Further, the label lists ingredients that are not in the product, according to the formulation, including "sage extract," "peppermint," "red clover," and "licorice."

3.   Your Relief, Foundation, Fit, and Sleep products are misbranded within the meaning of section 403(s)(2)(C) of the Act [21 U.S.C. § 343(s)(2)(C)] because the labels fail to identify the part of the plant (e.g., root, leaves) from which each botanical dietary ingredient in the product is derived, as required by 21 CFR 101.4(h)(1).  For example:

- The Fit label does not list the plant parts for the ingredients sage, peppermint, black pepper, red clover, licorice, cocoa, guarana extract, Mucuna pruriens, and horseradish.

- The Relief, Sleep, and Foundation labels all list horseradish extract, cocoa, and red clover, but do not list the part(s) of the plants used.

- The Foundation label does not list the plant parts for turmeric or black pepper.

4.   Your Relief, Foundation, Fit, and Sleep products are misbranded within the meaning of section 403(q)(5)(F) of the Act [21 U.S.C. § 343(q)(5)(F)] in that the presentation of nutrition information does not comply with 21 CFR 101.36. For example:

- The nutrition information is not enclosed in a box using hairlines, and it does not meet other general formatting requirements, as required by 21 CFR 101.36(e).

- The serving size declared on the product label is incorrect, causing all nutrition information to be incorrect.

- A symbol (e.g., asterisk), which refers to the same symbol placed at the bottom of the nutrition label that is followed by the statement "Daily Value not established," must be placed under the heading "% Daily Value," if present, or immediately following the quantitative amount by weight for the proprietary blend in accordance with 21 CFR 101.36(c)(3).

5.   Your Relief, Foundation, Fit, and Sleep products are misbranded within the meaning of section 403(q)(1)(A) of the Act [21 U.S.C. § 343(q)(1)(A)] because the serving size declared on the labels are incorrect. Serving size for a dietary supplement is the maximum amount consumed per eating occasion as recommended on the product label as defined in 21 CFR 101.9(b) and 21 CFR 101.12(b) Table 2. For example, the Relief product dosage is to take 2-3 capsules for maintenance, or for increase support to take 3-6 capsules, or for a therapeutic dose to take 7-9 capsules. The serving size listed should be 9 capsules.


The violations cited in this letter are not intended to be an all-inclusive list of violations that exist at your facility or in connection with your products. You are responsible for investigating and determining the causes of the violations identified above and for preventing their recurrence or the occurrence of other violations. It is your responsibility to ensure that your firm is in compliance with all requirements of the Act and all implementing regulations. You should take prompt measures to correct all violations described in this letter. Failure to promptly correct these violations may result in enforcement action by the FDA without further notice, including injunction or seizure.

**We offer the following additional comments:**

1.   Your firm received a letter dated March 30, 2017, from the Center for Food Safety and Applied Nutrition (CFSAN) regarding an adverse event entered into the CFSAN Adverse Event Reporting System (CAERS). This letter explained an adverse event that was reported was allegedly associated with one of your products, Relief, and that FDA has not evaluated this report or associated it with the use of your product, Relief.  However, based on information collected during the inspection of your firm, it does not appear that you conducted an investigation of this complaint. Please note that the requirements of 21 CFR 111.560 include that all complaints must be reviewed by a qualified person to determine whether the product complaint involves a possible failure of a dietary supplement to meet any of its specifications, or any other requirements of 21 CFR Part 111, and also that quality control personnel must review and approve the decisions about whether to investigate a product complaint.

For your information, section 761(c) of the Act requires that you submit a report of a serious adverse event associated with any of your dietary supplements no later than 15 business days after a report of the event is received through the address or phone number provided on your product labels. These serious adverse event reports must be submitted under the MedWatch Form 3500A. More information on adverse event reporting can be found on FDA's website at **www.fda.gov (http://www.fda.gov/)**, in the publication "Questions and Answers Regarding Adverse Event Reporting and Recordkeeping for Dietary Supplements as required by the Dietary Supplement and Nonprescription Drug Consumer Protection."

2.   It appears that your complaint forms (GnuPharma Laboratory Testing Form for Customer Complaint Inquiry and GnuPharma Process Data Collection Form) do not meet the requirements of 21 CFR 111.570(2)(ii)(C) and 21 CFR 111.570(2)(ii)(D) in that there is no provision to record the date and nature of the complaint; this information is also not included as required complaint information in the SOP for Handling Customer Complaint & Customer Satisfaction.

3.   Your firm's name and address are not listed on the correct panels of the Relief, Foundation, Fit, and Sleep labels, 21 CFR 101.2(b), and there is intervening material between the nutrition information and the

name and address, 21 CFR 101.2(e).

4.    The FDA disclaimer statement on the Relief, Foundation, Fit, and Sleep product labels is not presented correctly using the language that is given in 21 CFR 101.93.

5.    Your Relief, Foundation, and Sleep labels list the ingredient Theobromine cocoa, which is not the correct Latin binomial name.  It should be *Theobroma cacao*.

6.    The dietary ingredients contained in the proprietary blend are not indented under the term "Proprietary Blend" as required by 21 CFR 101.36(c)(2) on the labels of your Relief, Foundation, Fit, and Sleep products.

7.    We note that the Foundation, Relief, Sleep, and Fit product labels all declare the same 697 mg quantitative amount per serving of their proprietary blends. We suggest that your firm check this amount on the labels for possible typographical or other errors.

You should notify this office in writing within fifteen (15) business days from your receipt of this letter, of the specific steps you have taken to correct the noted violations, including an explanation of each step taken to prevent their recurrence. In your response, you should include documentation of your corrective actions. If you cannot complete all corrective actions before you respond, you should explain the reason for your delay and state when you will correct the remaining deficiencies.

Section 743 of the Act [21 U.S.C. § 379j-31] authorizes FDA to assess and collect fees to cover FDA's costs for certain activities, including re-inspection-related costs. A re-inspection is one or more inspections conducted subsequent to an inspection that identified noncompliance materially related to a food safety requirement of the Act, specifically to determine whether compliance has been achieved. Re-inspection-related costs means all expenses, including administrative expenses, incurred in connection with FDA's arranging, conducting, and evaluating the results of the re-inspection and assessing and collecting the re-inspection fees [21 U.S.C. § 379j-31(a)(2)(B)]. For a domestic facility, FDA will assess and collect fees for re-inspection-related costs from the responsible party for the domestic facility. The inspection noted in this letter identified noncompliance materially related to a food safety requirement of the Act. Accordingly, FDA may assess fees to cover any re-inspection-related costs.

Your written response should be sent to Jamie M. Bumpas, Compliance Officer, U.S. Food and Drug Administration, 4040 North Central Expressway, Suite 300, Dallas, TX 75204. If you have questions regarding any issues in this letter, please contact Ms. Bumpas at 214-253-5336.

Sincerely,
/S/
Edmundo Garcia, Jr.
District Director
Program Division Director
Office of Human and Animal Food, WD3

Cc:
Oklahoma State Department of Health
Lynnette Jordan, Director
Consumer Health Services

1000 Northeast 10th Street
Oklahoma City, Oklahoma 73117

> **More in Warning Letters**
> **(/ICECI/EnforcementActions/WarningLetters/default.htm)**

# The Health Management Group Inc. 6/6/18



Cincinnati District Office
6751 Steger Drive
Cincinnati, OH 45237
Telephone: (513) 679-2700
FAX: (513) 679-2772

June 6, 2018

**Warning Letter 547614**

**VIA UPS**

Charles Sekeres, Owner/CEO
Health Management Group Inc
395 Springside Drive
Akron, OH 44333

Dear Mr. Sekeres:

The Food and Drug Administration (FDA) conducted an inspection of your facility located at 1450 Firestone Parkway Suite H, Akron, OH 44301, from December 28, 2017, to January 26, 2018. During the inspection, our investigator identified a number of violations of the Current Good Manufacturing Practice (CGMP) in Manufacturing, Packaging, Labeling, or Holding Operations for Dietary Supplement regulations, Title 21, Code of Federal Regulations, Part 111 (21 CFR 111). These violations cause your dietary supplements to be adulterated within the meaning of section 402(g)(1) of the Federal Food, Drug, and Cosmetic Act (the Act) [21 U.S.C. § 342(g)(1)] in that they have been prepared, packed, or held under conditions that do not meet CGMP regulations for dietary supplements.

We also reviewed the labeling of your "AM/PM FAT BURNING & APPETITE SUPPRESSING WEIGHT CONTROL PATCHES," including your websites, www.24hourthermogenics.com, www.dietcenter.com, and www.pwlc.com, where you market and/or offer for sale the "AM/PM Weight Control Patches." Based on

our review, we have determined that your "AM/PM Weight Control Patches" is an unapproved new drug in violation of sections 505(a) and 301(d) of the Act [21 U.S.C. §§ 331(d) and 355(a)].

In addition, we have reviewed the labeling for your Diet Center and the Advanced 24 Hour Thermogenics brand products, including product labels and your websites at www.dietcenter.com and www.24thermogenics.com. Based on our review, we have concluded that your products are misbranded under section 403 of the Act [21 U.S.C. § 343], and regulations implementing the dietary supplement labeling requirements of the Act, which are found in 21 CFR 101. You can find the Act and FDA regulations through links on FDA's website at **www.fda.gov (http://www.fda.gov/)**.

**Unapproved New Drug**

Your product "AM/PM FAT BURNING & APPETITE SUPPRESSING WEIGHT CONTROL PATCHES" is a drug under section 201(g)(1)(C) of the Act [21 U.S.C. § 321(g)(1)(C)], because it is an article (other than food) intended to affect the structure or any function of the body.  Claims on your product label, promotional labeling, and websites, www.24hourthermogenics.com, www.dietcenter.com, and www.pwlc.com, that document the intended use of your product include, but are not limited to, the following:

- "Fat Burning & Appetite Suppressing"
- "Burn the fat . . . Kill the hunger . . . Lose the weight . . ."
- "The AM Patch helps promote weight loss with ingredients that target fat burning, increased energy and enhanced metabolism . . ."
- "The PM Patch helps promote weight loss with ingredients that focus on evening appetite suppression . . ."

Moreover, the "AM/PM FAT BURNING & APPETITE SUPPRESSING WEIGHT CONTROL PATCHES" is a "new drug" under section 201(p) of the Act [21 U.S.C. § 321(p)], because it is not generally recognized as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling. Under sections 301(d) and 505(a) of the Act [21 U.S.C. §§ 331(d) and 355(a)], a new drug may not be introduced or delivered for introduction into interstate commerce unless an FDA-approved application is in effect for it.

**Dietary Supplement CGMP Violations**

The December 28, 2017, to January 26, 2018, inspection of your facility revealed the following significant violation of the CGMP requirements for dietary supplements: You failed to establish and follow written procedures for the responsibilities of the quality control operations, including written procedures for conducting a material review and making a disposition decision, and for approving or rejecting any reprocessing, as required by 21 CFR 111.103. Specifically, you have no written procedures for the responsibilities of the quality control operations.

We acknowledge receipt of your written response to the FDA 483 (Inspectional Observations), which we received on February 23, 2018. Your response states, "All our current bottles that are re-bottled for use in our online kits will now come prepackaged with expiration dates and specific lot numbers contained on the bottle labels," and "All our supplements will now be prepackaged by our manufacturer." This response does not address the requirements to establish and follow written procedures for the responsibilities of your quality control operations for approving for release, or rejecting, any packaged and labeled dietary supplements received at your firm for distribution. While we acknowledge that you now plan to contract out

the manufacturing, packaging, and labeling of your dietary supplements, to the extent that another firm manufactures, packages, and/or labels your dietary supplements on your behalf that your firm releases for distribution under your firm's name, your firm has an obligation to know what and how manufacturing activities are performed so that your firm can make decisions related to whether the packaged and labeled dietary supplement products conform to established specifications and whether to approve and release the products for distribution [see 72 Fed. Reg. 34752, 34790 (June 25, 2007)]. Although a firm may contract out certain dietary supplement manufacturing, packaging, and/or labeling operations, it cannot contract out its ultimate responsibility to ensure that the dietary supplement it places into commerce (or causes to be placed into commerce) is not adulterated for failure to comply with dietary supplement CGMP requirements (see United States v. Dotterweich, 320 U.S. 277, 284 (1943) (explaining that an offense can be committed under the Act by anyone who has "a responsible share in the furtherance of the transaction which the statute outlaws"); United States v. Park, 421 U.S. 658, 672 (1975) (holding that criminal liability under the Act does not turn on awareness of wrongdoing, and that "agents vested with the responsibility, and power commensurate with that responsibility,  to devise whatever measures are necessary to ensure compliance with the Act" can be held accountable for violations of the Act). In particular, the Act prohibits a person from introducing or delivering for introduction, or causing the delivery or introduction, into interstate commerce a dietary supplement that is adulterated under section 402(g) for failure to comply with dietary supplement CGMP requirements (see 21 U.S.C. § 342(g) and 331(a)). Thus, a firm that contracts out some or all of its operations must establish a system of production and process controls to ensure the quality of the dietary supplement and that the dietary supplement is packaged and labeled as specified in the master manufacturing record (21 CFR 111.55). Your firm's quality control personnel must ensure that the manufacturing, packaging, labeling, and holding operations ensure the quality of your dietary supplements and that the dietary supplements are packaged and labeled as specified in the master manufacturing record, as required by 21 CFR 111.105. Further, your firm must have documentation of the quality control personnel review and approval for release of any packaged and labeled dietary supplement (21 CFR 111.127(h) and 21 CFR 111.140(b)(2)).

Once you have established your quality control written procedures, you must implement quality control operations in your holding operations, as required by 21 CFR 111.65.

**Misbranded Dietary Supplements**

In addition, we performed a review of the labeling for your dietary supplement products and found that they are misbranded under section 403 of the Act (21 U.S.C. § 343) in that the labeling for these products does not comply with the labeling requirements for dietary supplements, as follows:

1.     Your Diet Center Cal-Mag 90 tablets and 28 tablets, Diet Center Vitamin & Mineral, and Diet Center Anti-Oxidant products are misbranded within the meaning of section 403(s)(2)(B) of the Act [21 U.S.C. § 343(s)(2)(B)] in that the labeling for each product fails to include a statement of identity as a "dietary supplement" as required by 21 CFR 101.3(g).

2.     Your Diet Center Cal-Mag 28 tablets, Diet Center Vitamin & Mineral, and Diet Center Anti- Oxidant" products are misbranded within the meaning of section 403(q)(5)(F) of the Act [21 U.S.C.§ 343(q)(5)(F)] because the presentation of nutrition information is not in accordance with 21 CFR 101.36. For example:

    o   Your Diet Center Cal-Mag 28 Tablets product label does not indicate the number of servings, as required by 21 CFR 101.36(b) .
    o   Your Diet Center Cal-Mag 28 tablets, Vitamin & Mineral, and Anti-Oxidant" product labels do not use the required term Daily Value (DV), as required by 21 CFR 101.36(b)(2)(iii)(A); the labels incorrectly list the term "U.S. RDA".

    o   Your Diet Center Cal-Mag 28 tablets, Vitamin & Mineral, and Anti-Oxidant" product labels fail to indicate "Supplement Facts" and present the nutrition information in the appropriate format, as required by 21 CFR 101.36(e).

    o   Your Diet Center Cal-Mag 28 tablets product label fails to indicate the source of the calcium, as required by 21 CFR 101.36(d).

    o   Your 24 Hour Thermogenics Powerful Liquid Enhancing Concentrate product label fails to list (b)(3)-dietary ingredients within the Supplement Facts label, as required by 21 CFR 101.36(b)(3). Furthermore, we note that some of the botanical (b)(3)-dietary ingredients do not include the specific plant part. In particular, if the entire or whole plant is used, that information should be included in the listing of the dietary ingredient.

Your Diet Center Cal-Mag 28 Tablets product is misbranded within the meaning of section 403(q)(1)(A) of the Act [21 U.S.C. § 343(q)(1)(A)] because the product label fails to include a serving size in accordance with 21 CFR 101.36(b). The terms "serving" or "serving size" for a dietary supplement are defined in 21 CFR 101.9(b) and 21 CFR 101.12(b) Table 2, as the maximum amount recommended on the label for consumption per eating occasion.

3.    Your 24 Hour Thermogenics Powerful Liquid Enhancing Concentrate and 24 Hour Thermogencis EFA's Essential Fatty Acid Supplement products, and Diet Center Cal-Mag 90 Tablets and 28 Tablets, Diet Center Vitamin & Mineral, and Diet Center Anti-oxidant product label(s) are misbranded within the meaning of section 403(y) of the Act [21 U.S.C. § 343(y)] in that each product label fails to bear a domestic address or domestic phone number through which the responsible person (as described in section 761) may receive a report of a serious adverse event with such dietary supplements. Specifically, each product label does not include a complete domestic address or domestic phone number.

The violations cited in this letter are not intended to be an all-inclusive statement of violations that exist in connection with your products. It is your responsibility to ensure that your products comply with all requirements of the Act and federal regulations. You should take prompt measures to correct all violations described in this letter. Failure to take appropriate corrective actions may subject your firm and products to further actions, such as injunction or seizure.

Additionally, we have the following comments:

    o   Your 24 Hour Thermogenics EFA's Essential Fatty Acid Supplement and Powerful Liquid Enhancing Concentrate, Diet Center Cal-Mag, Diet Center Vitamin & Mineral and Diet Center Antioxidant products are misbranded under section 403(e)(1) [21 U.S.C. § 343(e)(1)] of the Act in that the labels fail to declare the place of business, including the ZIP code, in accordance with 21 CFR 101.5. You should verify all your product labels to make sure they meets this requirement.

    o   Your 24 Hour Thermogenics Powerful Liquid Enhancing Concentrate and 24 Hour Thermogenics EFA's Essential Fatty Acid Supplement products, and Diet Center Antioxidant product label(s) are misbranded under section 403(r)(6) in that the labels fail to make a declarative statement for the lack of evaluation of the product by FDA and that the product is not intended to diagnose, treat, cure, or prevent any disease in accordance with 21 CFR 101.93(c)(1). We note the terms "thermogenic" and "anti-oxidant" are structure function claims.

    o   Your 24 Hour Thermogenics Powerful Liquid Enhancing Concentrate product label declares chromium polynicotinate as a dietary ingredient. Chromium is a (b)(2)-dietary ingredient (see 21 CFR 101.36(b)(2)). If the serving size contains 2% or more of the RDI for chromium, the chromium should be declared in the supplement facts label section intended for (b)(2)-dietary ingredients. The

source of the chromium may be declared either following the declaration of chromium and/or in the ingredients list" in accordance with 21 CFR 101.36(d) and 21 CFR 101.4(g).

o    Your 24 Hour Thermogenics Powerful Liquid Enhancing Concentrate contains the statement "Percent Daily Value based on a 2,000 Calorie Diet." This statement is required when the percent of Daily Value is declared for total fat, saturated fat, total carbohydrate, dietary fiber, or protein in accordance with 21 CFR 101.9(c) and 21 CFR 101.36(b)(2)(iii)(D).

o    Your 24 Hour Thermogenics Powerful Liquid Enhancing Concentrate contains the term "Vitamin B3" within the supplement facts label. The correct name should be only "niacin" in accordance with 21 CFR 101.9(c)(8)(iv).

o    You told the FDA investigator that you intended to market "AM/PM Weight Control Patches" as a dietary supplement. However, it does not meet the definition of a dietary supplement under section 201(ff)(2)(A)(i) of the Act [21 U.S.C. § 321(ff)(2)(A)(i)], which defines a dietary supplement, among other things, as a product intended for ingestion. Topical patch products and other products that are not intended for ingestion are not dietary supplements.

If you believe that your products are not in violation of the Act, include your reasoning and any supporting information for our consideration. You should notify this office in writing within fifteen (15) business days from your receipt of this letter of the specific steps you have taken to correct the noted deviations, including an explanation of each step taken to prevent their recurrence. In your response, include documentation of your corrective actions, as well as copies of related documents. If you cannot complete all corrective actions before you respond, we expect that you will explain the reason for your delay and state when you will correct the remaining deficiencies.

Section 743 of the Act (21 U.S.C. 379j-31) authorizes FDA to assess and collect fees to cover FDA's costs for certain activities, including reinspection-related costs. A reinspection is one or more inspections conducted subsequent to an inspection that identified noncompliance materially related to a food safety requirement of the Act, specifically to determine whether compliance has been achieved. Reinspection-related costs means all expenses, including administrative expenses, incurred in connection with FDA's arranging, conducting, and evaluating the results of the reinspection and assessing and collecting the reinspection fees (21 U.S.C. 379j-31(a)(2)(B)). For a domestic facility, FDA will assess and collect fees for reinspection-related costs from the responsible party for the domestic facility. The inspection noted in this letter identified noncompliance materially related to a food safety requirement of the Act. Accordingly, FDA may assess fees to cover any reinspection-related costs.

Send your response to Stephen J. Rabe, Compliance Officer at the Food & Drug Administration, Cincinnati District Office, 6751 Steger Drive, Cincinnati, OH 45237. If you have questions regarding any issue in this letter, please contact Mr.Rabe at 513-679-2700 extension 2163 or at: Stephen.rabe@fda.hhs.gov.


Sincerely,
/S/
Steven B. Barber
Director, Division V
Office of Human and Animal Foods Operations - East

**More in Warning Letters**

**(/ICECI/EnforcementActions/WarningLetters/default.htm)**