1  **THE WESTON FIRM**
2  GREGORY S. WESTON (239944)
   *greg@westonfirm.com*
3  1405 Morena Blvd., Suite 201
   San Diego, CA 92110
4  Telephone:   (619) 798-2006
5  Facsimile:    (619) 343-2789

6  **Counsel for Plaintiff**

7  **UNITED STATES DISTRICT COURT**

8  **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

9

| | |
|---|---|
| 10 | Case No. 2:19-cv-4409-ODW-SK |
| | Pleading Type: Class Action |
| 11  TIFFNI ALTES, on behalf of herself | |
| 12  and all others similarly situated, | **PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT** |
| 13              Plaintiff, | |
| 14        v. | Judge: The Honorable Otis D. Wright |
| 15 | Date: September 30, 2019 |
| 16  BULLETPROOF 360, INC., | Time: 1:30 p.m. |
| | Location: Courtroom 5D |
| 17              Defendant. | |
| 18 | |

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.    Introduction ....................................................................................... 1

II.   Plaintiff States a Claim for False Advertising. ............................... 1

III.  The "Prior Substantiation Doctrine" Is Inapplicable Here. ........... 5

IV.   Plaintiff Adequately Alleges the Bulletproof Cold Brew Coffee Product Are Misbranded. ....................................................................................... 6

V.    Bulletproof 360's Challenged Claims Render the Products Unapproved New Drugs ..................................................................................................... 8

VI.   Bulletproof Makes Unauthorized Health Claims. ........................ 10

      A.    Website Claims Are Subject to 21 C.F.R. § 101.14 .......... 10

      B.    Bulletproof's Heart Health Website Claim Violates 21 C.F.R. § 101.14. ................................................................................ 11

VII.  Plaintiff Adequately Alleges a Claim for Unfair Business Practices. .................... 13

VIII. Plaintiff Has Standing to Challenge the Entire Alleged Advertising Campaign. ... 14

IX.   The FAC Alleges Facts With Sufficient Particularity. ................. 17

X.    Conclusion .................................................................................... 21

*Altes v. Bulletproof 360, Inc.*, Case No. 2:19-cv-4409-ODW-SK
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

1

2

# TABLE OF AUTHORITIES

3

4

**CASES**

5

6
*Berkoff v. Masai U.S. Corp.*,
   2011 U.S. Dist. LEXIS 164839 (C.D. Cal. June 1, 2011) ...................................... 15

7

8
*Beyer v. Symantec Corp.*,
   333 F. Supp. 3d 966 (N.D. Cal. 2018) .................................................................... 18

9

10
*Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
   637 F.3d 1047 (9th Cir. 2011) ................................................................................ 18

11

12
*Chapman v. Skype Inc.*,
   220 Cal. App. 4th 217 (2013) ................................................................................... 2

13

14
*Colgan v. Leatherman Tool Grp., Inc.*,
   135 Cal. App. 4th 663 (2006) ................................................................................... 1

15

16
*Comm. on Children's Television, Inc. v. Gen. Foods Corp.*,
   35 Cal. 3d 197 (1983) ...................................................................................... 14, 20

17

18
*Daniel v. Ford Motor Co.*,
   806 F.3d 1217 (9th Cir. 2015) ................................................................................ 19

19

20
*Davidson v. Kimberly-Clark Corp.*,
   889 F.3d 956 (9th Cir. 2018) .................................................................................. 19

21

22
*Engel v. Novex Biotech, Ltd. Liab. Co.*,
   689 F. App'x 510 (9th Cir. 2017) ............................................................................. 6

23

24
*Finney v. Ford Motor Co.*,
   2018 U.S. Dist. LEXIS 93823 (N.D. Cal. June 4, 2018) ......................................... 19

25

26
*Franz v. Beiersdorf, Inc.*,
   2015 U.S. Dist. LEXIS 102784  (S.D. Cal. Aug. 3, 2015) ......................................... 5

27

28

*Altes v. Bulletproof 360, Inc.*, Case No. 2:19-cv-4409-ODW-SK
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

*Hadley v. Kellogg Sales Co.*,
    2019 U.S. Dist. LEXIS 136791 (N.D. Cal. Aug. 13, 2019) ............................ 11, 12

*Hadley v. Kellogg Sales Co.*,
    243 F. Supp. 3d 1074 (N.D. Cal. 2017) ............................................ 1, 2, 4

*Hadley v. Kellogg Sales Co.*,
    273 F. Supp. 3d 1052 (N.D. Cal. 2017) ................................................ 4

*Hawkins v. Kroger*,
    906 F.3d 763 (9th Cir. 2018) .......................................................... 7

*In re Tobacco II*,
    46 Cal. 4th 298 (2009) ............................................................ 14, 15

*Kasky v. Nike, Inc.*,
    27 Cal. 4th 939 (2002) ................................................................ 2

*Kordel v. United States*,
    335 U.S. 345 (1948) ................................................................. 10

*Kwan v. SanMedica Int'l*,
    854 F.3d 1088 (9th Cir. 2017) ........................................................ 5

*Kwikset v. Super. Court*,
    51 Cal. 4th 310 (2011) .............................................................. 18

*Lovette v. Zale Del., Inc.*,
    2019 U.S. Dist. LEXIS 100305 (S.D. Cal. June 13, 2019) ............................... 4

*McKell v. Wash. Mut., Inc.*,
    142 Cal. App. 4th 1457 (2006) ....................................................... 13

*Milan v. Clif Bar & Co.*,
    2019 U.S. Dist. LEXIS 141403 (N.D. Cal. Aug. 20, 2019) .............................. 18

*Opperman v. Path, Inc.*,
    84 F. Supp. 3d 962 (N.D. Cal. 2015) .......................................... 15, 16, 17

*Opperman v. Path, Inc.*,
    87 F. Supp. 3d 1018 (N.D. Cal. 2014) ................................................ 15

iv

*Reid v. Johnson & Johnson*,
    780 F.3d 952 (9th Cir. 2015) ........................................................................ 7

*Robinson v. J.M. Smucker Co.*,
    2019 U.S. Dist. LEXIS 78069 (N.D. Cal. May 8, 2019) ......................... 2, 4

*Rojas-Lozano v. Google, Inc.*,
    59 F. Supp. 3d 1101 (N.D. Cal. 2016) ...................................................... 13

*Rubio v. Capital One Bank*,
    613 F.3d 1195 (9th Cir. 2010) .................................................................. 13

*Sandoval v. PharmaCare US, Inc.*,
    730 F. App'x 417 (9th Cir. 2018) ............................................................. 10

*Stanley v. Bayer Healthcare LLC*,
    2012 U.S. Dist. LEXIS 47895 (S.D. Cal. Apr. 3, 2012) ........................... 6

*Stewart v. Elecrolux Home Prods.*,
    2018 U.S. Dist. LEXIS 63078 (E.D. Cal. Apr. 13, 2018) ....................... 18

*Trazo v. Nestle USA, Inc.*,
    2013 U.S. Dist. LEXIS 113534 (N.D. Cal. Aug. 9, 2013) ........................ 7

*Tubbs v. AdvoCare Int'l, LF*,
    2017 U.S. Dist. LEXIS 147681 (C.D. Cal. Sep. 12, 2017) ....................... 6

*U.S. v. Berst*,
    2012 U.S. Dist. LEXIS 135325 (D. Or. Aug. 2, 2012) ........................... 11

*U.S. v. Innovative Biodefense, Inc.*,
    2019 U.S. Dist. LEXIS 99683(C.D. Cal. Feb. 22, 2019) ........................ 10

*Williams v. Gerber Co.*,
    552 F.3d 934 (9th Cir. 2008) .......................................................... 1, 2, 4

**STATUTES**

21 U.S.C. § 321(g)(1) ....................................................................................... 8

21 U.S.C. § 321(g)(1)(B) ................................................................................. 8

v

*Altes v. Bulletproof 360, Inc.*, Case No. 2:19-cv-4409-ODW-SK
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

**OTHER AUTHORITIES**

Blazer, D. *Mayo Clinic Minute: Why the 'bulletproof coffee' trend isn't a magic bullet*. The Mayo Clinic. December 6, 2018 ...........................................................19

*Food Labeling: Nutrient Content Claims, General Principles, Petitions, Definition of Terms; Definitions of Nutrient Content Claims for the Fat, Fatty Acid, and Cholesterol Content of Food*, 58 Fed. Reg. 2302–01, 2310 (proposed Jan. 6, 1993)..................................................................7

Freedman, *Association of Coffee Drinking with Total and Cause Specific Mortality*. 366 N. ENGL. J. MED. 1891-1904 (2012) .................................3

Mayo Clinic. *Osteoperosis*.........................................................................12

Wei Lui, et al. *Current understanding of coronary artery calcification*. 12 J. GERIATR. CARDIOL. 668-75 (2015)......................................................11

## I. **Introduction**

Defendant has made tens of millions of dollars selling extremely expensive coffee drinks marketed with false claims. These false claims are made about both its own coffee, and also include attacks on its competitors, falsely claiming they are dangerous and only Bulletproof coffee lacks "toxic mold" that "saps energy." It also makes flatly illegal claims about the so-called "Brain Octane Oil" it adds to its coffee. Its label has four separate nutrient content claims about sugar and protein that flatly violate clear FDA regulations. The complaint describes in detail why these claims are false, citing scientific studies and medical experts. It includes the full text of the false website claims and full label images, and explains in detail the exact FDA regulations they violate. It describes when and where the plaintiff purchased Bulletproof and what she relied on.

Defendant's arguments that its label claims don't violate FDA regulations rest on absurd interpretation of what a "nutrient content claim" is, one belied by direct and recent authority from the Ninth Circuit, as well as the FDA's clear definition. It makes the standard "lack of specificity" arguments  all fraud defendants make without engaging with the actual allegations of the FAC. Finally, Defendant wholly fails to even discuss the standard for alleging claims under the "unfair" prong of the UCL, much less argue the claims to not satisfy the UCL unfair prong. Having failed to do this, the argument is waived.

## II. **Plaintiff States a Claim for False Advertising.**

To "state a claim under the . . . CLRA, or the fraudulent prong of the UCL, Plaintiff must allege that the packaging for Defendant's products is 'likely to deceive' a 'reasonable consumer.'" *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1092 (N.D. Cal. 2017) (quoting *Williams v. Gerber Co*., 552 F.3d 934, 938 (9th Cir. 2008)). "A reasonable consumer is the ordinary consumer acting reasonably under the circumstances" not an expert "versed in the art of inspecting and judging a product, in the process of its preparation or manufacture." *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 682 (2006) (internal quotations omitted).

1

California's anti-fraud "laws prohibit 'not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'" *Hadley*, 243 F. Supp. 3d at 1092 (quoting *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951 (2002)). On a motion to dismiss, a court need decide "only whether the trier of fact reasonably **could** conclude that consumers are likely to be deceived." *Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 227 (2013) (emphasis added). The issue of "whether a practice is 'deceptive, fraudulent, or unfair' is generally a question of fact that is not appropriate for resolution on the pleadings." *Robinson v. J.M. Smucker Co.*, 2019 U.S. Dist. LEXIS 78069, at *8 (N.D. Cal. May 8, 2019). As the Ninth Circuit put it in another food fraud case, "whether a business practice is deceptive will usually be a question of fact" and it is a "rare situation in which granting a motion to dismiss is appropriate." *Williams*, 552 F.3d at 938-39.

All of Bulletproof's marketing supports a central misleading message: Bulletproof Coffee is made from exceptionally high-quality ingredients compared to its toxin-filled competitors, and further that its formulation is the product of careful research and optimizes good health. The particular deceptive marketing claims include

- Certified Clean Coffee
- Brain Octane Oil
- 0g Sugar
- Zero Sugar
- Lasting Energy
- All Day Energy + Protein
- Sustain Your Mind and Body

- Bulletproof® Coffee with collagen protein is delicious coffee plus grass-fed butter and Bulletproof Brain Octane® oil—extracted from the most potent part of the coconut—to power your brain and body, with grass-fed collagen protein added for strong muscles and healthy skin

- It's clean coffee certified to be free of 27 energy-sapping toxins, plus grass-fed butter and Bulletproof Brain Octane Oil—extracted from the most potent part of

2

the coconut—to power your brain and body and give you steady, all day energy. FAC ¶¶13-20. These claims are used to sell Bulletproof products for more than twice other premium coffee brands: $20 to $25 per pound for coffee beans, $6.30 for tiny 5oz chocolate bars, and for the product at issue here, the premade 11oz Bulletproof Cold Brew, for $4.50 to $5.00 per serving, more than double the price of Starbucks single-serving coffees.

While precise wording varies a bit, all of the marketing feeds the same key deceptive points. First, the scare tactics about coffee that doesn't cost $5 per serving or $20 per pound: it is full of "toxins." Defendant claims that "not all coffee is created equal," and that Bulletproof's coffee is "tested to be free of 27 common toxins to keep you mentally and physically feeling your best." FAC ¶ 21.

The toxins it constantly refers to are called mycotoxins, and they are common in food, including apples, chocolate, wheat, peanuts, figs, beans, cheese, and vegetable oil. There is overwhelming evidence the levels they are sometimes present in coffee is no danger, and indeed are more than 95% less than the level that would have any effect on the body. In short, "coffee intake" does not even represent even "**a potential risk** for consumers with respect to individual mycotoxin contamination." FAC ¶ 30 (emphasis added) (quoting a scientific study of this exact question). Contrary to Defendant's implication that consuming competitor coffee results in health risks, regular coffee consumption has been shown to be "inversely associated with total and cause-specific mortality." FAC ¶ 31; Freedman, *Association of Coffee Drinking with Total and Cause Specific Mortality*. 366 N. ENGL. J. MED. 1891-1904 (2012). Thus, a reasonable consumer could be misled into believing that the coffee used in Bullet Proof's Cold Brew products provides a health benefit in comparison to other coffee products, when in fact, there is no such distinction. Indeed, Bulletproof is simply lying when it claims competing products have "energy-sapping mold toxins that slow you down" while its products "keep you mentally and physically feeling your best" and provide "better mental performance," "fat-burning power," "amplified energy, fat loss and metabolic burn." FAC ¶ 21.

3

*Altes v. Bulletproof 360, Inc.*, Case No. 2:19-cv-4409-ODW-SK
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

1    Similarly, Bulletproof 360 claims that consuming its "Brain Octane Oil," will

2    result in "fewer cravings," "curb[] snack attacks," and "power your brain." FAC ¶ 32.

3    Reasonable consumers seeking products which will aid in weight loss may be misled into

4    purchasing Bulletproof's Cold Brew products. However, a single 11oz container of

5    Bulletproof contains 8g of saturated fat. The FDA recommends consumers limit their

6    saturated fat consumption to 20g per day, meaning a single bottle of Bulletproof Cold

7    Brew Coffee contains 40% of the daily value recommended by the FDA. FAC ¶ 34. The

8    American Heart Association ("AHA") recommends consumers limit their saturated fat

9    consumption to 13g per day. FAC ¶ 35.

10    Further, contrary to Defendant's contention, it makes no difference that some of

11    the challenged claims are, examined in isolation and with no regard for their implications,

12    are "truthful." Mot. at. 4-6. "California's consumer protection statutes prohibit 'not only

13    advertising which is false, but also advertising which, although true, is either actually

14    misleading or which has a capacity, likelihood or tendency to deceive or confuse the

15    public.'" *Hadley v. Kellogg Sales Co.*, 273 F. Supp. 3d 1052, 1079 (N.D. Cal. 2017)

16    (quoting *Williams*, 552 F.3d at 938-9). Moreover, "whether a business practice is

17    deceptive will usually be a question of fact not appropriate for decision at the pleading

18    stage, and dismissal is not appropriate even when the advertisement, 'although true, is

19    either actually misleading or which has a capacity, likelihood or tendency to deceive or

20    confuse the public.'" *Lovette v. Zale Del., Inc.*, 2019 U.S. Dist. LEXIS 100305, at *6

21    (S.D. Cal. June 13, 2019) (quoting *Williams*, 553 F. 3d at 938). Here, the FAC provides a

22    detailed explanation as to why each of the challenged representations "has a capacity,

23    likelihood or tendency to deceive or confuse the public." *Hadley*, 243 F. Supp. 3d at 1092

24    (internal quotation and citations omitted). At this stage, nothing further is required.

25    *Robinson v. J.M. Smucker Co.*, 2019 U.S. Dist. LEXIS 78069, at *8 (N.D. Cal. May 8,

26    2019). Moreover, Defendant's arguments that there is no deception in its "truthful" zero

27    sugar claims, for example, are preempted as a defense by federal law. Specifically, the

28    FDA has carefully examined when companies should be allowed to make unqualified

4

claims about being "zero sugar," "low sugar," and "sugar free." And it has determined that products like Bulletproof, extremely high in calories and saturated fat, simply are not allowed to make such unqualified sugar-free claims. *See* 21 C.F.R. §§ 101.13(h) and 101.60.

## III. The "Prior Substantiation Doctrine" Is Inapplicable Here.

Defendant's contention that "Plaintiff's UCL and CLRA claims are premised on an explicit and inferred lack of substantiation of Bulletproof's claims," Mot. at 17, is unavailing. While Defendant is correct that "[i]ndividuals may not bring suit under the UCL or the CLRA alleging only that advertising claims lack substantiation," Plaintiff brings no such claims here. *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1091 (9th Cir. 2017) (internal quotations and citations omitted). The "prior substantiation doctrine" applies in cases involving "[c]laims that rest on a lack of substantiation, instead of a provable falsehood." *Franz v. Beiersdorf, Inc.*, 2015 U.S. Dist. LEXIS 102784, at *6 (S.D. Cal. Aug. 3, 2015).  In such cases, the plaintiff "merely contends" the claims made by the defendant "lack substantiation." *Franz*, 2015 U.S. Dist. LEXIS 102784, at *7.

Bulletproof 360's reliance on *Kwan* is misplaced. In that action, the court dismissed false advertising claims where the plaintiff only alleged "SanMedica's marketing claims **are not properly substantiated** as required by federal and state law regulating the sale of dietary supplements." *Kwan*, 854 F.3d at 1092 (emphasis added). Further, the plaintiff also explicitly raised allegations such as:

> There is no Credible Scientific Evidence to Support Defendant's 682% HGH Increase Representation, HGH Fountain Of Youth Benefit Representations, And SeroVital Fountain of Youth And Body Composition Representations

*Kwan*, 854 F.3d at 1092. Thus, in *Kwan*, the plaintiff was truly attempting to "require defendants to substantiate their advertising claims." *Kwan*, 854 F.3d at 1096. Here, our allegations are not that Bulletproof's marketing lacks substantiation, but are *in fact* false and misleading. Moreover, this cannot be a defense to many of the claims here, since they are also premised on deceptive omissions and flat, explicit violations of specific FDA

5

1  rules under the UCL "unlawful" prong.

2      Nor do Defendant's other citations help it. In the unpublished *Engel v. Novex*
3  *Biotech, Ltd. Liab. Co.*, the plaintiff alleged the claims were "not supported by any
4  reliable clinical trials and that a comprehensive search could not produce any publication
5  to support claims that defendant's product." 689 F. App'x 510, 510 (9th Cir. 2017). This
6  is a classic illustration of an insufficient "lack of substantiation" claim.

7      Likewise, in *Stanley v. Bayer Healthcare LLC*, the plaintiff alleged the claims were
8  "**not substantiated** by the vast majority of generally accepted scientific literature
9  currently available relating to probiotics." 2012 U.S. Dist. LEXIS 47895, at *5 (S.D. Cal.
10  Apr. 3, 2012) (emphasis added).

11      In *Tubbs v. AdvoCare Int'l, LF*, the "Plaintiffs allege that Defendant's marketing is
12  unsubstantiated, not false." 2017 U.S. Dist. LEXIS 147681, at *6 (C.D. Cal. Sep. 12,
13  2017). This is simply not one of those cases. We allege the marketing is *false* and
14  *deceptive*, not merely unsubstantiated. We also allege it was designed, in every facet, to
15  convey a unified set of highly misleading claims. To take a specific example, we
16  challenge the "Zero Sugar" and "0g Sugar" claims. FAC ¶ 57. We don't doubt that the
17  product has "zero sugar," nor that Defendant has plenty of substantiation for the claim.
18  Rather, we allege it is misleading to call a highly unhealthy product that is basically
19  coffee mixed with a large amount of butter and very high in calories and saturated fat
20  "zero sugar." And the FDA, which makes the rules for these sorts of claims on food, is in
21  complete agreement, and prohibits these claims unless qualified by multiple disclosure
22  statements. *See* 21 C.F.R. §§ 101.13 and 101.60. FAC ¶ 33, 58.

23  **IV.  Plaintiff Adequately Alleges the Bulletproof Cold Brew Coffee Product Are**
24  **Misbranded.**

25      Bulletproof 360's contention that its "0g Sugar" and "15g Collagen Protein" claims
26  are not nutrient content claims subject to 21 C.F.R. § 101.13 and 21 C.F.R. § 101.60,
27  Mot, at 20-21, fails. Indeed, it is contrary to recent, published, and binding authority from
28  the Ninth Circuit, as well as the definitions within the regulations. "Nutrient content

6

claims are statements that 'expressly or implicitly characterize[] the level of a nutrient.'" *Reid v. Johnson & Johnson*, 780 F.3d 952, 959 (9th Cir. 2015) (quoting 21 C.F.R. § 101.13(b)). How can statements that a product contains "0g Sugar" and "15g Collagen Protein" not "characterize the level of" sugar and protein in a product?

In *Reid*, the Ninth Circuit determined the defendant's:

> "No Trans Fat" claim is an expressed claim because it "is [a] direct statement about the level . . . of [trans fat] in the food." *Id*. § 101.13(b)(1).

*Reid*, 780 F.3d at 962. Similarly, in *Hawkins v. Kroger*, the Ninth Circuit held the defendant's "0g Trans Fat" claim was "an expressed nutrient content claim that the product does not contain trans fat." 906 F.3d 763, 771 (9th Cir. 2018). Similarly, in *Trazo v. Nestle USA, Inc.*, Nestle argued its "0g Trans Fat" claim was not a nutrient content claim "because it [did] not characterize the 'amount' of the nutrient." 2013 U.S. Dist. LEXIS 113534, at *32 (N.D. Cal. Aug. 9, 2013). The court rejected this argument, holding the "statement is an express nutrient content claim because it provides a 'direct statement about the level (or range) of a nutrient in [a] food –that it has no trans fat." *Trazo*, 2013 U.S. Dist. LEXIS 113535, at *32 (quoting 21 C.F.R. § 101.13(h)(1). Here, Bulletproof 360's "0g Sugar" and "15g Collagen Protein" claims are no different—they expressly "characterize[] the level of a nutrient" in the product, rendering them "nutrient content claims." *Reid*, 780 F.3d at 959.

Defendant relies on a strained reading of *Food Labeling: Nutrient Content Claims, General Principles, Petitions, Definition of Terms; Definitions of Nutrient Content Claims for the Fat, Fatty Acid, and Cholesterol Content of Food*, 58 Fed. Reg. 2302–01, 2310 (proposed Jan. 6, 1993) to argue that "FDA interpretive guidance corroborates the language of the statute in that factual statements regarding amounts do not 'characterize the level' of a nutrient, and so are not regulated as nutrient content claims." Mot. at 22. However, in both *Reid* and *Hawkins*, the Ninth Circuit cited this document in finding that the "No Trans Fat" and "0g Trans Fat" claims *were in fact* nutrient content claims. *See Reid*, 780 F.3d at 960; *Hawkins*, 906 F.3d at 771. Thus, Defendant's interpretation of the

7

1  FDA guidance document it cites is untenable and barred by binding authority.

2  As Bulletproof concedes, "nutrient content claims" are "subject to 21 C.F.R. §

3  101.13" and 21 C.F.R. § 101.60. Mot. at 20-21. Because the challenged representations

4  constitute nutrient content claims but fail to include the required disclosures, they violate

5  21 C.F.R. §§ 101.13 and 101.60.

6  **V.    Bulletproof 360's Challenged Claims Render the Products Unapproved New**

7  **Drugs.**

8  Bulletproof 360 contends the Products' "labeling and website advertising does not

9  in any way indicate that [they] are "intended for use in the diagnosis, cure, mitigation,

10  treatment, or prevention of disease . . ." 21 U.S.C. § 321(g)(1)(B). Mot. at 19. This

11  argument lacks merit.

12  Without any support, Defendant argues the challenged representations cannot

13  possibly constitute "drug" claims because the Products are not "non-food items" and

14  because the claims do not make "specific reference to a given disease." Mot. at 19-20. A

15  plain reading of 21 U.S.C. § 321(g)(1) belies this argument.  Pursuant to 21 U.S.C. §

16  321(g)(1), any product which is "intended for use in the diagnosis, cure, **mitigation**,

17  **treatment**, or **prevention** of disease" is an unapproved new drug. (emphasis added)

18  Nothing in the statutory language suggests that "drug" product's must label necessarily

19  make "specific reference to a given disease" as Defendant contends. Mot. at 20-21.

20  Rather, it is the product's *intended use* that is relevant. If Defendant's argument that a

21  drug must make "a specific reference to a given disease" were accepted, that would mean

22  products marketed to "induce sleep" and "normalize blood sugar" and "raise levels of T

23  cells" would not be considered insomnia, diabetes, and AIDS drugs, as long as they avoid

24  actually naming the disease.

25  Here are the actual facts and law: Defendant makes repeated claims that the "Brain

26  Octane Oil" it adds to Bulletproof Cold Brew is a breakthrough product with almost

27  miraculous *medical* effects on the brain, body, and cognition: "steady, all day energy,"

28  "lasting energy," "Curbs Snack Attacks," "Fewer cravings," "no more cravings,"

8

"suppressing hunger," and "better mental performance." And that's just the claim Defendant makes about "Brain Octane Oil." It further claims the butter it adds to Bulletproof "helps push the calcium to your bones—not your arteries."

Attached to the FAC is an FDA enforcement letter to a tea company that made similar medical claims, warning it that under 21 U.S.C. § 321(f) its tea was an unapproved new drug. It, like Bulletproof, makes medical claims without "a specific reference to a given disease." These illegal unapproved new drug claims include

- "Assists With Cravings . . . Assists With Anxiety . . . Assists With Withdrawal"
- "We support a healthy Endocannabinoid System (ECS). […] the ECS is the lead system and plays a strong role in both feeding and craving behaviors. Feeding craving behaviors are not only how we eat but at a more basic level, they are how our bodies as for resources. […] a resource need is signaled within the brain and we experience hunger pangs. This is your body asking for resources… We are providing a nutritious alternative, and we believe much healthier, resources for the body."

FAC Ex. 1 at 47-48. As with Defendant's coffee, this tea company runs awful of the unapproved new drug law even without "a specific reference to a given disease" elephant-size loophole Defendant's motion conjures up without any citation.

In another warning letter, the FDA "determined that Cheerios Toasted Whole Grain Oat Cereal is promoted for conditions that cause it to be a drug because the product is intended for use in the prevention, mitigation, and treatment of disease." Weston Decl. Ex. 1. The FDA reached this conclusion even though the product was a food and its packaging did not reference a specific disease by name because the "claims indicate that Cheerios® is intended for use in lowering cholesterol, and *therefore in preventing, mitigating, and treating the disease hypercholesterolemia*." *Id.* (emphasis added). Notably, the FDA inferred the connection to a disease, as the claims on the product made no reference to  hypercholesterolemia. *Id. See also* Weston Decl. Ex. 2 (FDA waning letter stating a drinkable Aloe Vera juice is an unapproved new drug due similar claims); Weston Decl. Ex. 3 (FDA warning letter to manufacturer of herbal tea stating its claims

9

render the product an unapproved new drug).

**VI.    Bulletproof Makes Unauthorized Health Claims.**

      **A.    Website Claims Are Subject to 21 C.F.R. § 101.14.**

      Defendant's contention that 21 C.F.R. § 101.14 is not applicable to claims made on the product website fails. <u>The FDA regularly issues warning letters to companies whose website claims violate food labeling regulations</u>. *See* Weston Decl. Ex. 4.

> [Y]our website includes the following statements . . . Together these statements and heart symbol are an implied health claim . . . FDA's regulation at 21 CFR 101.14(a)(4) disqualifies foods from making health claims that contain more than 13 grams of fat per RACC; per labeled serving; or per 50 grams.

*See also* Weston Decl. Ex. 5 ("[Y]our label *and website* characterize the relationship of these substances to a disease or health-related condition (i.e., allergies, atopic dermatitis). Because the product label and your website bear health claims that were not authorized by FDA, the product is misbranded within the meaning of section 403(r)(1)(B) of the Act") (emphasis added).

      Further, Defendant's contention that "[t]he FDCA is clear that the term 'label' does not include websites," Mot. at 23, is contrary to both the Supreme Court and Ninth Circuit. While at the time the FDCA was written, the Internet did not yet exist, other forms of product advertising such as brochures did. The U.S. Supreme made clear such advertising was subject to the FDCA and FDA regulations. *See Kordel v. United States*, 335 U.S. 345, 349-50 (1948). The Ninth Circuit followed *Kordel* in *Sandoval v. PharmaCare US, Inc.*, holding a product website could be part of a consumer's challenge to an alleged unapproved new drug because it contained information about the product, "including the product's ingredients, their beneficial properties, and their ability to treat diseases." 730 F. App'x 417, 420 (9th Cir. 2018). Thus, the "website representations" were subject to FDA regulations because, while not part of the physical label, the website was part of the product's labeling. *Id*. at 420. *See also U.S. v. Innovative Biodefense, Inc.*, 2019 U.S. Dist. LEXIS 99683, at *11 (C.D. Cal. Feb. 22, 2019) ("[S]tatements on a drug

10

product's website generally constitute part of the products labeling."). In short, Bulletproof's "website qualifies as labeling within the meaning of the FDCA because it is written, printed, or graphic matter . . . accompanying [the product]." *U.S. v. Berst*, 2012 U.S. Dist. LEXIS 135325, at *12 (D. Or. Aug. 2, 2012).

## B.   Bulletproof's Heart Health Website Claim Violates 21 C.F.R. § 101.14.

Bulletproof argues 21 C.F.R. § 101.14, governing when food companies can make "health claims," does not apply to its health claims. Mot. at 23. Pursuant to 21 C.F.R. § 101.14,

> a health claim is "any claim made on the label or in the labeling of a food […] that expressly or by implication, […] characterizes the relationship of any substance to a disease or health-related condition." An implied health claim "include[s] those statements, symbols, vignettes, or other forms of communication that suggest, within the context in which they are presented, that a relationship exists between the presence or level of a substance in the food and a disease or health-related condition."

*Hadley v. Kellogg Sales Co.*, 2019 U.S. Dist. LEXIS 136791, at *55-56 (N.D. Cal. Aug. 13, 2019) (quoting 21 C.F.R. § 101.14).

Defendant's contention that "the Bulletproof statement does not reference any specific disease or health-related condition at all," Mot. at 23, defies logic. The Bulletproof website includes the following claim:

> Butter from grass-fed cows is higher in butyrate, a fatty acid that aids in digestion as well as Vitamin K2, which helps push the calcium to your bones— not your arteries.

FAC ¶ 66. The claim suggests that consuming the product will improve heart and bone health by "push[ing] calcium to your bones—not your arteries." In fact, "[c]oronary artery calcification (CAC) is highly prevalent in patients with coronary heart disease (CHD) and is associated with major adverse cardiovascular events." Wei Lui, et al. *Current understanding of coronary artery calcification*. 12 J. GERIATR. CARDIOL. 668-75 (2015). Studies have "determined that medial calcification is associated with arterial

11

stiffness, which increases risk for adverse cardiovascular events." *Id.* Thus, Bulletproof's claim that the products will "helps push the calcium to your bones—not your arteries" indisputably "suggest[s] . . . relationship exists between the presence or level of a substance in the food and a disease or health-related condition." *Hadley*, 2019 U.S. Dist. LEXIS 136791, at *56.

The challenged health claim further suggests that consuming the products will improve bone health by "pushing calcium to your bones." "Osteoporosis causes bones to become weak and brittle — so brittle that a fall or even mild stresses such as bending over or coughing can cause a fracture."[1] "A lifelong lack of calcium plays a role in the development of osteoporosis." *Id.* "Low calcium intake contributes to diminished bone density, early bone loss and an increased risk of fractures." *Id.* Thus, Defendant's claim that Bulletproof products "push calcium to your bones" suggests that "that a relationship exists between the presence or level of" calcium in the product and osteoporosis. Finally, "aids digestion" is a claim about indigestion, a "health-related condition" for which millions of Americans take both over the counter and prescription drugs.

Indeed, while there are sometimes tough cases, the claim here fits the definition of a health claim, and in multiple ways, as explicitly as one could possibly get. But the FDA does not allow unapproved health claims on food by using even indirect language. Even "symbols" or "vignettes" that merely "by implication" involve a health claim for a substance in a food requires FDA approval. Many companies have made the effort to get such approval. For example, Quaker applied and was granted permission to make the claim its oatmeal helps heart health. As with so much of its practices, such as falsely denigrating competing coffees as containing "energy-sapping toxins," Defendant's policy of ignoring the rules the rest of us have to comply with harms not only its customers, but the right of other businessmen to compete in a marketplace free of such practices.

---

[1] Mayo Clinic. *Osteoporosis. Available at* https://www.mayoclinic.org/diseases-conditions/osteoporosis/symptoms-causes/syc-20351968 (last visited August 22, 2019).

### VII.   Plaintiff Adequately Alleges a Claim for Unfair Business Practices.

"A business act or practice may violate the UCL if it is either unlawful, unfair, or fraudulent. Each of these three adjectives captures a separate and distinct theory of liability." *Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010).

"'A business practice is unfair within the meaning of the UCL if it violates established public policy *or* if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits.'" *Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d 1101, 1117 (N.D. Cal. 2016) (quoting *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1473 (2006)). "In determining whether a business practice is unfair under this approach, California courts balance the 'impact on its alleged victim' against 'the reasons, justifications, and motives of the alleged wrongdoer." *Rojas-Lozano*, 159 F. Supp. 3d at 1117 (quoting *McKell*, 142 Cal. App. 4th at 1473). "In short, this balancing test must weigh the utility of the defendants' conduct against the gravity of the harm to the alleged victim." *Rojas-Lozano*, 159 F. Supp. 3d at 1117.

Here, the FAC plainly and clearly, in addition to the fraud and label-law claims, also alleges Defendant's conduct was unfair under the "separate and distinct" unfair practice theory. *Rubio*, 613 F.3d at 1203. For instance:

This action is brought to remedy Defendant's unfair, deceptive, and unlawful conduct.

Bulletproof 360's failure to comply with the FDA regulations its CEO ridicules as "antihuman" endangers the health of its customers, and further gives it an unfair advantage over competitors that do comply with state and federal law.

Multiple studies show consumption of Bulletproof coffee causes a "rise cholesterol levels" and "worsening lipid levels" which represents a "cardiovascular risk factor."

Defendant's conduct described here is unfair because it is immoral, unethical, unscrupulous, and offends public policy; the gravity of its conduct outweighs any benefit; and the injury to consumers is substantial, not outweighed by any countervailing benefits to competition, and not one that consumers themselves could reasonably have avoided.

13

FAC at ¶¶ 10, 42, 78 and 97. *See also id.* at ¶ 59 (illustrating Defendant's "unfair advantage" over competitors with photos of competing products that comply with FDA zero-sugar disclosure rules). These allegations of unfair practices are completely ignored by Defendant's motion to dismiss and waived on reply.

## VIII.   Plaintiff Has Standing to Challenge the Entire Alleged Advertising Campaign.

Bulletproof's contention that Plaintiff lacks standing to challenge claims made on its product website, Mot. at 11, fails. Where "a plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements." *In re Tobacco II*, 46 Cal. 4th 298, 328 (2009). This is exactly the case here: No, Plaintiff didn't read and rely on every single deceptive claim made by Defendant. If that were necessary, nobody would ever have standing to stop a multi-faceted fraud campaign like this. Rather, as the California Supreme Court held, the standard under the UCL and other anti-fraud laws is only "exposure" to the campaign, not a complete immersion in every part of it. Indeed, the California Supreme Court has rejected this argument for decades.

> Plaintiffs allege that defendants carried out a large scale program of deceptive advertising in which the specific advertisements change constantly, but all follow a pattern of making, in one form or another, certain misleading and deceptive representations.

*Comm. on Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal. 3d 197, 214 (1983). In such circumstance, a plaintiff need not allege reliance on the "exact language of every deceptive statement; it is sufficient for plaintiff to describe a scheme to mislead customers, and allege that each misrepresentation to each customer conforms to that scheme." *Comm. On Children's Television*, 35 Cal. 3d at 212-13. Indeed, if Defendant's standard were actually the rule the effect "would not be limited to discouraging private suits; it would also seriously hamper suits by public officials seeking to enjoin schemes of unfair competition and deceptive advertising." *Id.* at 214.

14

Here, Plaintiff alleges that throughout the Class Period, "the Bulletproof Coffee label and website made . . . drug claims." FAC ¶ 38. This was part of "multi-media campaign" to promote the products as healthy. FAC ¶ 9.  Because Plaintiff has identified "specific statements from the advertising campaign," described "how [those statements] are misleading, and "allege[d] exposure to a long-term advertising campaign," she is not required to allege that she relied on "particular advertisements or statements", including those made on Bulletproof's website. *In re Tobacco* II, 46 Cal. 4th at 328. Where, as here "the plaintiff[] alleged continued exposure to defendant's advertising campaign, the California Supreme Could [has] held that the plaintiffs did not need to 'point to specific advertisements' to have standing to bring the claims." *Berkoff v. Masai U.S. Corp.*, 2011 U.S. Dist. LEXIS 164839, at *12-13 (C.D. Cal. June 1, 2011).

> *In re Tobacco II*, itself, yields the rule that if a plaintiff alleges a long-term advertising campaign, the advertisements at issue should be similar enough to be considered as part of one campaign, or the delivery of a single message or set of messages, rather than a  disparate set of advertising content published in the ordinary course of commerce.

*Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1050 (N.D. Cal. 2014).

In that action,  the plaintiffs  "allege that Apple engaged in a mass marketing campaign, whereby it 'consciously and continuously misrepresented its iDevices as secure, and that the personal information contained on iDevices—including, specifically, address books, could not be taken without their owners' consent." *Opperman v. Path, Inc.*, 84 F. Supp. 3d 962, 971 (N.D. Cal. 2015). Apple argued that "Plaintiffs have failed adequately to plead reliance because the named Plaintiffs have not identified which alleged misrepresentations they viewed, heard, or read, and therefore which they relied on in purchasing their iDevices." *Opperman*, 84 F. Supp. 3d at 976. The court pulled together decades of authority on these related issues as follows:

> First, a plaintiff must allege that she actually saw or heard the defendant's advertising campaign. Second, the advertising campaign must be sufficiently lengthy in duration, and widespread in dissemination, that it would be

15

unrealistic to require the plaintiff to plead each misrepresentation she saw and relied upon. Third, the plaintiff must describe in the complaint, and preferably attach to it, a representative sample of the advertisements at issue so as to adequately notify the defendant of the precise nature of the misrepresentation claim—what, in particular, defendant is alleged to have said, and how it was misleading. Fourth, the plaintiff must allege, and the court must evaluate, the degree to which the alleged misrepresentations contained within the advertising campaign are similar to each other. Fifth, each plaintiff must plead with particularity, and separately, when and how they were exposed to the advertising campaign, so as to ensure the advertisements were representations consumers were likely to have viewed, rather than representations that were isolated or more narrowly disseminated. And finally, sixth, the court must be able to determine when a plaintiff made his or her purchase or otherwise relied on defendant's advertising campaign, so as to determine which portion of that campaign is relevant.

*Opperman*, 84 F. Supp. 3d at 976-77.

Here, Plaintiff's allegation that she was exposed to Defendant's advertising campaign, FAC ¶¶ 86-87, is sufficient. *See Opperman*, 84 F. Supp. 3d at 978 (plaintiff's allegations that they "viewed, heard, or read Apple's advertisements" were sufficient). "The pleading stage is not summary judgment; to the extent that allegations regarding individual Plaintiffs' exposure to [Bulletproof]'s advertising campaign are sparse, they can be tested after discovery allows the parties further factual development." *Opperman*, 84 F. Supp. 3d at 978.

Plaintiff further alleges this campaign is "sufficiently lengthy in duration," extending from at least May 21, 2015 through the present. FAC ¶¶ 89, 111; *Opperman*, 84 F. Supp. 3d at 979 (finding five-year long campaign sufficient and noting that "where courts have found that media campaigns are more targeted or extensive, shorter periods of time—even as short as nine months—have been considered 'long-term.'").

Additionally, Plaintiff "describe[s] in the complaint" a "representative sample of the advertisements at issue so as to adequately notify the defendant of the precise nature of the misrepresentation claim—what, in particular, defendant is alleged to have said, and

16

how it was misleading." FAC ¶¶ 13-44; *Opperman*, 84 F. Supp. 3d at 976. Thus, this factor, too is satisfied.

For the fourth factor, Plaintiff has alleged that the "claims made by Defendant on the Bulletproof Cold Brew Coffee product labels and website imply that the products are a healthy alternative to regular coffee." FAC ¶ 27. Plaintiff alleges Bulletproof's deceptive advertising constitutes a "unified and consistent message" which is sufficient at this stage. *Opperman*, 84 F. Supp. 3d at 981.

For the fifth factor, Plaintiff pleaded "when and how [she was] exposed to the advertising campaign" *Opperman*, 84 F. Supp. 3d at 976. Specifically, she alleges the statements she relied on in deciding to purchase Bulletproof and that "on at least one occasion, would not have purchased Bulletproof Cold Brew Coffee absent these misleading claims, and never would have purchased Bulletproof had she known it was misbranded, deceptively marketed, an unapproved new drug, and sold in violation of California and federal law." FAC ¶¶ 86-87.

For the sixth factor, "the court must be able to determine when a plaintiff made his or her purchase." *Opperman*, 84 F. Supp. 3d at 977. Here, "Plaintiff purchased Bulletproof Cold Brew Coffee products in both the pre-October 2018 and post-October packaging variations pictured" with her most recent purchase occurring in "December 2018." FAC ¶ 83.

Having satisfied each of these factors, "Plaintiff's *Tobacco II* allegations, taken as a whole, are sufficient to survive [Bulletproof's] motion to dismiss." *Opperman*, 84 F. Supp. 3d at 983.

## IX.  The FAC Alleges Facts With Sufficient Particularity.

Defendant contends the FAC does not comply with Rule 9(b)'s because she does not "plead specific facts as to: (1) Plaintiff's reliance (i.e., the 'what'); and (2) her basis for believing that the alleged misleading labeling is false." Mot. at 24.

Plaintiff alleges that she relied on each of the challenged claims appearing on the Product label. FAC ¶ 86.

17

*Altes v. Bulletproof 360, Inc.*, Case No. 2:19-cv-4409-ODW-SK
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

Contrary to Defendant's contention, the FAC identifies "the who, when, what, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (internal quotations and citations omitted). Defendant contends "the FAC fails to allege 'why' Plaintiff believes the Products' labeling is false and, if so, 'how' she came to that conclusion." Mot. at 25. However, Defendant misstates the applicable legal standard.

> Actual reliance in the context of CLRA, UCL, and FAL claims requires a plaintiff allege that she (1) was exposed to (*e.g.*, heard, read, or saw) a defendant's representation regarding a product, (2) that was false and/or misleading, (3) to which a reasonable person would attach importance (materiality), and (4) incurred economic injury as a result (*e.g.*, by purchasing the product for more money than the plaintiff would have (or not purchasing the product at all) but for the misrepresentation).

*Stewart v. Electrolux Home Prods.*, 2018 U.S. Dist. LEXIS 63078, at *13 (E.D. Cal. Apr. 13, 2018) (following *Kwikset v. Super. Court*, 51 Cal. 4th 310, 327 (2011)). In false advertising cases, Rule 9(b)'s heightened pleading requirement is satisfied where plaintiffs "specifically allege[] a list of the packaging statements" that they "recall reading and relying on, prior to their purchase" and further allege that they "would not have purchased the  [products] if they knew that their labeling claims were false and misleading in that the Products were not as healthy as represented but actually harm health." *Milan v. Clif Bar & Co.*, 2019 U.S. Dist. LEXIS 141403, at *9 (N.D. Cal. Aug. 20, 2019). *See also Beyer v. Symantec Corp.*, 333 F. Supp. 3d 966, 980 (N.D. Cal. 2018) (plaintiff's allegations that he "reviewed the product page" prior to purchase satisfied Rule 9(b)'s heightened pleading standard).[2]

---

[2] Defendant also cites a decision from this Court from March 2018 to argue Plaintiff was required to allege "how she came to that conclusion" that the labeling here was false. MTD at 25. Defendant, however, fails to inform the Court that later in 2018, the Ninth

18

1    Further, with respect to Altes's allegations that the Bulletproof Cold Brew was
2 deceptively misbranded pursuant to 21 C.F.R. §§ 101.13 and 101.60, she need only allege
3 "that she actually relied on the omission in the sense that 'had the omitted information
4 been disclosed, one would have been aware of it and behaved differently.'" *Finney v.*
5 *Ford Motor Co.*, 2018 U.S. Dist. LEXIS 93823, at *11 (N.D. Cal. June 4, 2018) (quoting
6 *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015)).

7    Here, Altes alleges that when "purchasing Bulletproof Cold Brew Coffee," she
8 "was seeking a product that was beneficial to her health." FAC ¶ 85. "In deciding to
9 purchase Bulletproof Cold Brew Coffee, Mrs. Altes relied on the label as a whole" as
10 well as Defendant's specific misleading representations. FAC ¶ 86. "Mrs. Altes, on at
11 least one occasion, would not have purchased Bulletproof Cold Brew Coffee absent these
12 misleading claims, and never would have purchased Bulletproof had she known it was
13 misbranded, deceptively marketed, an unapproved new drug, and sold in violation of
14 California and federal law." FAC ¶ 87.

15    Further, Defendant's contention that Plaintiff failed to "explain why Plaintiff
16 considers the Products' labeling to be false, or how she came to that conclusion," Mot. at
17 25, is unavailing. Plaintiff alleges that "[c]ontrary to Bulletproof 360's misleading health
18 claims, Katherine Zeratsky, a dietician at the Mayo Clinic, advises:

19       When you add things like butter and coconut oil to your coffee, you're adding a
20       significant amount of saturated fat and a significant amount of calories . . .
21       those extra calories and the imbalance it might be creating in your diet might
22       not work for you and your long-term health.[3]

23 FAC ¶ 25. Further, Plaintiff explains in detail that Defendant's "clean caffeine" claims

---

25 Circuit expressly rejected such a requirement in a published decision, *Davidson v.*
26 *Kimberly-Clark Corp.*, 889 F.3d 956, 966 (9th Cir. 2018).

27 [3] Blazer, D. *Mayo Clinic Minute: Why the 'bulletproof coffee' trend isn't a magic bullet.*
   The Mayo Clinic. December 6, 2018.

28

are misleading. FAC ¶ 30 ("While mycotoxins may be present in some coffee beans, studies have shown that "coffee intake does not represent a potential risk for consumers with respect to individual mycotoxin contamination."). Plaintiff further explains that Bulletproof 360's claims that the products contain "0g Sugar" and that ""Brain Octane Oil,'. . . will result in 'fewer cravings,' 'curb[] snack attacks,' and 'power your brain'" are misleading because

> A single bottle of Bulletproof Cold Brew Coffee contains 8g of saturated fat. The FDA recommends consumers limit their saturated fat consumption to 20g per day, meaning each small bottle of Bulletproof Cold Brew Coffee contains 40% of the daily value recommended by the FDA.

FAC ¶ 34. "Americans seeking to improve their health would not benefit from consuming Bulletproof Cold Brew products due to their high saturated fat content." FAC ¶ 37. *See also* FAC ¶ 33 (""0G SUGAR' . . claim is deceptive and unlawful due to the products' high content of calories, total fat, and saturated fat, and Defendant's failure to provide the 'not a low calorie food' disclaimer as required by 21 C.F.R. § 101.13(h)(1)); FAC ¶ 60 ("Bulletproof 360's failure to comply with 21 C.F.R. § 101.60 is deceptive because '[c]onsumers may reasonably be expected to regard terms that represent that the food contains no sugars or sweeteners e.g., 'sugar free,' or 'no sugar,' as indicating a product which is low in calories or significantly reduced in calories.'" 21 C.F.R. § 101.60.). Thus, Plaintiff has satisfied her burden under Rule 9(b). Defendants, no matter how detailed a complaint is, no matter how specific, no matter how many scientific studies are cited, can always demand more, however the California Supreme Court made clear that the UCL simply does not require consumer fraud complaints about long-term, multifaceted frauds contain "thousands of pages setting out specifics." *Children's Television,* 35 Cal. 3d at 214. Rather "it is sufficient for plaintiff to describe a scheme to mislead customers, and allege that each misrepresentation to each customer conforms to that scheme." *Id*. at 212-13.

## X.    <u>Conclusion</u>

The motion to dismiss should, respectfully, be denied. To the extent any part of the complaint is deemed defective by the Court, Plaintiff respectfully requests leave to amend.

DATED: August 30, 2019                    Respectfully Submitted,

<u>s/ Gregory S. Weston</u>
**THE WESTON FIRM**
GREGORY S. WESTON
1405 Morena Blvd., Suite 201
San Diego, CA 92110
Telephone:   (619) 798-2006
Facsimile:    (619) 343-2789

<u>**Counsel for Plaintiff**</u>